REPORTED

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

No. 1256

September Term, 2014

STATE OF MARYLAND

v.

PHILIP MORRIS, INC., ET AL.

Wright,
Reed,
Kenney, James A., III
  (Retired, Specially Assigned),

JJ. [1]

Opinion by Wright, J.

Filed:  October 2, 2015

[1]Judge Andrea M. Leahy and Judge Dan Friedman did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8-605.1.

# I. INTRODUCTION

This appeal arises from a Master Settlement Agreement ("MSA") between appellees, who are numerous cigarette manufacturers (the "Participating Manufacturers" or "PMs"),[1] and appellant, the State of Maryland ("Maryland"), along with 51 other states and territories (collectively, the "Settling States"). Specifically, it involves the multi-state arbitration of an MSA dispute over the "Non-Participating Manufacturer Adjustment" ("NPM Adjustment") – a potential reduction to the annual payment that the PMs make to the Settling States under the MSA, which is allocated among those states who failed to diligently enforce certain obligations under the MSA.

During the arbitration of the 2003 NPM Adjustment dispute, the PMs reached a settlement ("Term Sheet" agreement) with 22 states (the "Term Sheet States") before it was determined whether those states were diligent or non-diligent. Maryland and the other "Non-Term Sheet States" were also offered the settlement, but declined to join. In light of this partial settlement, the arbitrators (a "Panel" of three former federal judges) were tasked with resolving how the 2003 NPM Adjustment should be allocated to any Non-Term Sheet States who were found non-diligent. On March 12, 2013, the Panel

---

[1] The original PMs, Philip Morris USA, Inc., R.J. Reynolds Tobacco Co., and Lorillard Tobacco Co., filed one brief, and another brief was filed by certain subsequent PMs – including Commonwealth Brands, Inc., Compania Industrial de Tabacos Monte Paz, S.A., Daughters & Ryan, Inc., House of Prime A/S, Liggett Group LLC, Sherman 1400 Broadway N.Y.C Inc., King Maker Marketing, Inc., Top Tobacco, LP, Japan Tobacco International U.S.A., Inc., Kretek International, Inc., Peter Stokkebye Tobaksfabrik A/S, P.T. Djarum, Santa Fe Natural Tobacco Company, Inc., Von Eicken Group – and also on behalf of Farmers Tobacco Co. of Cynthiana, Inc.

interpreted the MSA's language and concluded that the NPM Adjustment should be allocated post-settlement pursuant to the "pro rata" method of judgment reduction.

After holding individual evidentiary hearings for the Non-Term Sheet States, whose diligence for 2003 was still contested, the Panel concluded that Maryland and five other Non-Term Sheet States were non-diligent and thus subject to the 2003 NPM Adjustment. On September 11, 2013, after assessing Maryland's enforcement record for 2003, the Panel found that Maryland lacked "a culture of compliance" and that its efforts "fell short of its efforts in earlier years."

Maryland filed motions in the Circuit Court for Baltimore City to vacate the Panel's awards for the 2003 NPM Adjustment that adopted the pro rata judgment-reduction method and that found Maryland to be non-diligent. On November 12, 2013, Maryland also filed a motion to compel the PMs to arbitrate Maryland's diligence for 2004 in a state-specific arbitration, rather than as part of a multi-state arbitration of the entire 2004 Adjustment dispute. On July 28, 2014, the circuit court denied all three motions, and on August 20, 2014, Maryland noted this appeal.

## II. QUESTIONS PRESENTED

We have rephrased Maryland's questions as follows:[2]

---

[2] In its brief, Maryland asked:

1)      Did the Arbitration Panel exceed its authority when it approved a side agreement between the Participating Manufacturers and the Term Sheet States that altered the MSA's reallocation provision, where the MSA prohibits amendments absent specific agreement by all affected parties, Maryland and other parties to the MSA expressly objected to the Panel's

2

1)      Did the circuit court err in refusing to vacate the Panel's award which adopted the pro rata judgment-reduction method in reallocating the 2003 NPM Adjustment only among the non-diligent, Non-Term Sheet States?

2)      Did the circuit court err in refusing to vacate the Panel's finding that Maryland was not diligent in 2003?

3)      Did the circuit court err in failing to order the PMs to arbitrate Maryland's diligence for 2004 in a state-specific arbitration?

For the reasons that follow, we answer only the first question in the affirmative, and reverse the circuit court's judgment regarding that issue. Accordingly, we remand the case for further proceedings not inconsistent with this opinion.

### III. FACTS

**A.      MSA**

In 1998, Maryland and the 51 other Settling States entered the MSA, thus settling their claims for "wrongful marketing and advertising of cigarettes, as well as damages based upon the costs of treating smoking-related illnesses," against three major cigarette manufacturers – Philip Morris USA, Inc., R.J. Reynolds Tobacco Co., and Lorillard

---

approval of the side agreement, and the Panel's approval of the side agreement operated to the substantial detriment of Maryland?

2)      Did the Arbitration Panel refuse to consider material evidence related to the enforcement efforts of the contested Term Sheet States, given that all of the states had entered an agreement for a national arbitration to determine, in one proceeding, the diligence of each of the states?

3)      Did the circuit court err in failing to order the Participating Manufacturers to arbitrate in a Maryland-specific proceeding their claim that Maryland did not diligently enforce the provisions of its Qualifying Statute during 2004, in light of the terms of the MSA and the prejudice Maryland experienced in the multi-state arbitration for 2003?

3

Tobacco Co. (collectively, "Original Participating Manufacturers" or "OPMs"). *State v. Philip Morris Inc.*, 179 Md. App. 140, 142-43 (2008). Since then, more than forty subsequent participating manufacturers ("SPMs") have joined the MSA. *Id.* at 145 n.2. In exchange for the dismissal of "any pending action and [a] release [of] all past and future claims" against them, the PMs agreed "to restrict the manner in which they market and advertise tobacco products and . . . to make a substantial annual payment to be allocated among the settling states." *Id.* at 145.

Pursuant to the MSA, the PMs do not make the annual payment ("MSA Payment") directly to the Settling States. *Id.* Rather, each PM is "required to make a single, nationwide annual payment into an escrow account on or before April 15" of each year, the exact amount of which is calculated annually by an "Independent Auditor . . . pursuant to a comprehensive formula contained within the MSA." *Id.* at 145-46. "The calculation begins with each original participating manufacturer paying into an escrow account its relative market share of the base amount for the calendar year." *Id.* at 146 (citing MSA § IX(c)(1)). That amount is then subject to several reductions and adjustments, including the NPM Adjustment. *Id.* (citing MSA §§ IX(c)(j), XI(a)(1)). Thereafter, the funds are "allocated among the settling states according to formulae set forth in the MSA." *Id.* at 146 n.3. Pursuant to the "allocable shares," Maryland is entitled to 2.2604570 percent of the PMs' annual payment. *Id.* (citing MSA § II(f)).

The NPM Adjustment, governed by Section IX(d) of the MSA, is a payment reduction designed to address the PMs' concern that "they would incur a competitive disadvantage to the non-participating manufacturers [("NPMs")], who were not subject to

4

the MSA's strict marketing restrictions and payment obligations." *Id.* at 146-47. Each year, PMs "may be eligible to take a NPM Adjustment if (1) the independent auditor determines that, during the year in question, the participating manufacturers collectively lose more than two percent of their pre-MSA market share to non-participating manufacturers and (2) an economic consulting firm determines that the MSA was a 'significant factor' contributing to that loss." *Id.* at 147 (citing MSA § IX(d)(1)). If these conditions are satisfied, then the PMs are entitled to the NPM Adjustment on their annual payment as to all Settling States, subject to one exception – the "diligence exception." *See* MSA § IX(d)(2).

Pursuant to the diligence exception, "[a] Settling State's Allocated Payment shall not be subject to an NPM Adjustment . . . if such Settling State continuously had a Qualifying Statute . . . in full force and effect during the calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year." MSA § IX(d)(2)(B). The MSA defines a "Qualifying Statute" as a "statute, regulation, law and/or rule . . . that effectively and fully neutralizes the cost disadvantages that the [PMs] experience vis-à-vis [NPMs] within such Settling State as a result of [the MSA]." MSA § IX(d)(2)(E). "Maryland enacted the model 'qualifying statute' contained in Exhibit T to the MSA, which is codified as Maryland's Escrow Act [Md. Code (1992, 2010 Repl. Vol.), § 16-401 *et seq.* of the Business Regulation Article]." *Philip Morris Inc.*, 179 Md. App. at 147. It requires all NPMs to:

> deposit into escrow a fixed sum per cigarette sold that is slightly less than the per-cigarette cost imposed by the MSA on participating manufacturers. These escrowed funds may ultimately be used to satisfy a judgment that the State may obtain against a non-participating manufacturer. If the funds are not so used within twenty-five years, they are returned to the non-participating manufacturer.

*Id.* at 148 (internal citations omitted). "[I]f a state has a 'qualifying statute' in full force and effect and diligently enforces that statute, the auditor must reallocate that state's share of the NPM Adjustment among the other states that do not qualify, 'pro rata in proportion to their respective Allocable Shares.'" *Id.* at 147 (quoting MSA § IX(d)(2)(C) ("Reallocation Provision")).

In other words, to incentivize the Settling States to be diligent, the MSA provides that the non-diligent States are collectively responsible for the total available NPM Adjustment, including what would have been the shares of the diligent states. Accordingly, the greater the number of diligent states, the larger the amount of NPM Adjustment that is reallocated to non-diligent states. *See id.* at 163 ("[T]he granting of an exemption to one Settling State will inexorably lead to the reallocation of its allocated portion of the NPM Adjustment to all other non-exempt Settling States. Each Settling State thus has a vital interest in the granting or denial of each other Settling State's individual claim for exemption.") (Citation omitted); *Com. ex rel. Kane v. Philip Morris USA, Inc.*, 114 A.3d 37, 44 (Pa. Commw. Ct. 2015) ("Generally, as the number of diligent states increase, the burden on non-diligent states increases. This is because an increase in the number of diligent states means that there is more adjustment reallocated among a smaller group.").

**B.      2003 NPM Adjustment**

In the present appeal, the primary dispute concerns the NPM Adjustment for 2003.

Although the PMs were entitled to take an NPM Adjustment that year, the Independent

Auditor decided not to apply it because the Settling States' diligence in enforcing their

respective Qualifying Statutes had not yet been determined.  *See Philip Morris Inc.*, 179

Md. App. at 148-49 ("[T]he participating manufacturers requested that the auditor apply

the 2003 NPM Adjustment to their April 2006 payments.  Maryland and the other settling

states, however, urged the auditor to deny the NPM Adjustment on the ground that the

settling states 'diligently enforced' their qualifying statutes.").  Therefore, the PMs

requested arbitration pursuant to MSA § XI(c), *id.* at 143, which states:

> Any dispute, controversy or claim arising out of or relating to calculations
> performed by, or any determinations made by, the Independent Auditor
> (including, without limitation, any dispute concerning the operation or
> application of any of the adjustments, reductions, offsets, carry-forwards
> and allocations described in subsection IX(j) or subsection XI(i)) shall be
> submitted to binding arbitration before a panel of three neutral arbitrators,
> each of whom shall be a former Article III federal judge.  Each of the two
> sides to the dispute shall select one arbitrator.  The two arbitrators so
> selected shall select the third arbitrator.  The arbitration shall be governed
> by the United States Federal Arbitration Act [9 U.S.C. § 1 *et seq.*].

On May 18, 2006, Maryland asked the Circuit Court for Baltimore City "for

declaratory relief, declaring that the auditor properly determined not to reduce the

participating manufacturers' MSA payments to reflect a NPM Adjustment."  *Philip*

*Morris Inc.*, 179 Md. App. at 149 (footnote omitted).  After hearing arguments on

October 5, 2006, the circuit court issued an order on January 19, 2007, compelling

arbitration, and we affirmed that decision on March 27, 2008.  *Id.* at 150, 167.

7

In December, 2008, the PMs entered into an Agreement Regarding Arbitration ("ARA") with almost every Settling State, including Maryland. According to the ARA, "[t]he 2003 NPM Adjustment shall be resolved through [a nationwide arbitration] pursuant to Section XI(c) of the MSA" in order to determine:

1.    Whether the Independent Auditor was correct in not applying the 2003 NPM Adjustment to the [PMs'] 2006 or prior annual payments . . . .

2.    Whether the June 2003 settlement agreements release in whole or in part, or provide a basis for excluding evidence relating to, the 2003 NPM Adjustment.

3.    Whether individual Settling States diligently enforced a Qualifying Statute in 2003 . . . .

4.    (a) Whether under Section XI(i)(2)(A) of the MSA, a transfer from the Disputed Payments Account to a [PM] should be accomplished through a transfer from the Disputed Payments Account to such [PM] or through an offset in favor of such [PM] accompanied by a transfer to the Settling States; and (b) under Section XI(i)(1)(B) of the MSA, under what circumstances, if any, should a transfer be made from the Disputed Payments Account to a Settling State that is determined to have diligently enforced a Qualifying Statute or whose diligent enforcement the [PMs] no longer contest.

5.    To the extent a Settling State may assert that the 2003 NPM Adjustment should be applied to another Settling State pursuant to Section IX(d)(2) of the MSA, a determination as to the validity of any such assertion.

The Panel[3] began proceedings on July 2, 2010, and entered various preliminary orders governing the conduct of the hearings. For example, on January 19, 2011, it

---

[3] The Panel consisted of Judge William G. Bassler, selected by the PMs; Judge Abner J. Mikva, selected by the Settling States; and Judge Fern M. Smith, selected by Judges Bassler and Mikva. All three arbitrators were former Article III federal judges.

8

concluded that the Settling States "must bear the burden of proving that they diligently enforced their respective Qualifying Statutes for purposes of the 2003 NPM Adjustment." In particular, the Panel determined that "no language in the MSA supports a finding that the States can by-pass an inquiry regarding whether they satisfied their contractual obligation for avoiding a payment adjustment through the NPM Adjustment." (Citation omitted).

By order dated May 23, 2011, the Panel added that "although the conditions to application of the NPM Adjustment under section IX(d)(1) had been met, without the diligent enforcement determination, there was no 'Available NPM Adjustment for the Auditor to apply and there would be no Available NPM Adjustment unless and until the diligent enforcement determination was made.'" Thus, according to the Panel, the Independent Auditor could not apply the 2003 NPM Adjustment and properly declined to do so.

Then, in an order dated July 1, 2011, the Panel concluded, in pertinent part:

(3)     Any Settling State whose diligent enforcement for the year 2003 is not contested by any PM or State[4] will be deemed [] by the Independent Auditor for purposes of Section IX(d)(2)(B)-(C) of the MSA as a Settling State that diligently enforced its Qualifying Statute for that year only and is therefore [] not subject [to] the 2003 NPM Adjustment.

(4)     The share of the 2003 NPM Adjustment (if any) of a Settling State whose diligent enforcement is not contested by any PM or State, will be governed by the reallocation provisions of Sections IX(d)(2) and IX (d)(4) of the MSA, and will thus be reallocated among all Settling

---

[4] The Panel set deadlines for PMs to contest the diligence of Settling States, and for Settling States to contest the diligence of other Settling States. However, neither Maryland nor any other Settling State contested the diligence of any other Settling State.

> States that did not diligently enforce a Qualifying Statute during 2003 as provided in those provisions.

In that order, the Panel noted that "[b]ecause a state bears the burden of proof when its claim of diligent enforcement [] is not challenged does not mean that there must be a hearing when the claim is unchallenged." Rather, "the burden to prove diligent [] enforcement comes into play only when a state's contested claim is required to [be] resolved."

On or about November 3, 2011, the PMs filed a notice of their intent to contest the diligence of 35 Settling States, including Maryland. Thereafter, the Panel scheduled individual evidentiary hearings for each of those 35 Settling States. A hearing devoted to Maryland's enforcement evidence took place from 8:30 a.m. to 5:00 p.m. on October 22-23, 2012, and from 8:30 a.m. to 3:30 p.m. on October 24, 2012. During that time, Maryland presented the testimony of two lay witnesses, one document summary witness, and three expert witnesses. Meanwhile, the PMs had three expert witnesses testify on their behalf.

On or about December 17, 2012, before the Panel had finished all of the state-specific hearings, the PMs and 19 of the Settling States "agreed to a Term Sheet for settlement" that purported to "resolve[] the 2003-12 NPM Adjustments as to the signatory States and revise[] the NPM Adjustment provision as to those States for the years following 2012." All of the remaining Settling States were invited to join the settlement, and three more did. Maryland declined the invitation.

The 22 total Term Sheet States had an aggregate allocable share of approximately 46% of the NPM Adjustment. Of those 22 states, the PMs had contested the diligence of 20. The Term Sheet, which was to become binding "upon the Panel's approval," did not address the MSA's Reallocation Provision – in particular, its effect on the reallocation of the 2003 NPM Adjustment among the Non-Term Sheet States.

In January 2013, the PMs and Term Sheet States filed a Proposed Stipulated Partial Award with the Panel, presenting alternatives for "how the 2003 NPM Adjustment will be allocated among the [Non-Term Sheet] States in light of the settlement." On February 22, 2013, many of the Non-Term Sheet States, including Maryland, filed a brief in opposition to the Proposed Stipulated Partial Award. In pertinent part, they argued that "the reallocation provisions of the proposed award are contrary to the MSA, adversely affect the majority states, and are not remedied by the proposed set-offs." Particularly, they urged:

> If the Panel chooses to enter an award regarding the settlement, the order should instruct the Independent Auditor to treat any contested [Term Sheet] State as non-diligent for purposes of calculating the allocation of the NPM Adjustment. That result is mandated by the plain language of the MSA unless and until the contested [Term Sheet] States prove their diligence. The MSA's reallocation structure requires a determination as to the diligence of each State because each State's potential exposure to an NPM Adjustment depends on every other State's diligence. The MSA's reallocation procedure requires that each State be determined diligent or not diligent and contains no exception for a partial settlement.

(Footnote omitted).

After hearing argument on the issues surrounding the Proposed Stipulated Partial Award, the Panel issued a Stipulated Partial Settlement and Award ("Partial Settlement

11

Award") on March 12, 2013.[5]  At the outset, the Panel noted that "the MSA does not directly speak as to the process to be used when some States settle diligent enforcement and some do not."  The Panel then ruled that it "ha[d] jurisdiction to rule on the issues raised concerning the MSA reallocation provisions and to determine how the 2003 NPM Adjustment will be allocated among the [Non-Term Sheet] States in light of the settlement."  According to the Panel, its "jurisdiction to interpret and determine the operation of the reallocation provisions is no less where a State is no longer contested because of a settlement."

Turning to the merits, the Panel concluded, in pertinent part:

> 1.      In light of the settlement, the 2003 NPM Adjustment will be allocated among the [Non-Term Sheet] States as follows.  The dollar amount of the 2003 NPM Adjustment will be reduced by a percentage equal to the aggregate Allocable Shares of the [Term Sheet] States as of the date of the Panel's Final Award . . . .  The Independent Auditor will treat the [Term Sheet] States as not subject to the 2003 NPM Adjustment, as that Adjustment amount is reduced as provided above, will be governed by the reallocation provisions of Sections IX(d)(2) and IX(d)(4) of the MSA, and will thus be reallocated among all [Non-Term Sheet] States that did not diligently enforce a Qualifying Statute during 2003 as provided in those provisions.  The maximum portion of the 2003 NPM Adjustment that can be applied to a [Non-Term Sheet] State remains as provided by Section IX(d)(2)(D) of the MSA.
>
> 2.      This judgment reduction is appropriate and adequate under the MSA and governing law.  Where multiple parties have a potential shared contractual obligation and some of them settle and some do not, the non-settling parties cannot necessarily block the settlement, but may be

---

[5] The Partial Settlement Award largely tracked the Proposed Stipulated Partial Award, with one significant addition – namely that the "relief, if any," for objecting states that believe they are negatively affected by the Partial Settlement Award, would be an "appeal to their individual MSA court."  Maryland's MSA court is the Circuit Court for Baltimore City.

entitled to a judgment reduction. The "three standard methods for reducing judgment against non-settling defendants after a partial settlement" are "*pro rata* (court divides the amount of the total judgment by the number of settling and non-settling defendants, regardless of each defendant's culpability), proportionate fault (after a partial settlement and trial of the non[-]settling defendants, the jury determines the relative culpability of all the defendants and the non-settling defendant pays a commensurate percentage of the total judgment), and *pro tanto* (the court reduces the non-settling defendant's liability for the judgment against him by the amount previously paid by the settling defendants, without regard to proportionate fault)."

3.      Where non-settling defendants are given the protection of the applicable judgment-reduction method required under the contract and law, they are not prejudiced by the partial settlement.

4.      Under Paragraph 1, the [Non-Term Sheet] States receive the *pro rata* reduction, under which the dollar amount of the 2003 NPM Adjustment will be reduced by a percentage equal to the aggregate Allocable Shares of the [Term Sheet] States. Construing the parties' contract, the Panel concludes that the MSA reallocation provisions indicate that the *pro rata* method is appropriate. These provisions use the specific term "pro rata," stating that the shares of diligent States are to be "reallocated among all other Settling States *pro rata* in proportion to their respective Allocable Shares." MSA § IX(d)(2)(C) (emphasis added); *see also* MSA § IX(d)(2)(D) ("pro rata in proportion to their respective Allocable Shares"). More fundamentally, the MSA also provides that the reallocation is not done on a relative fault basis. The amount of a diligent State's share that is reallocated is its *pro rata* share of the whole, not an amount derived from its particular fault level. Likewise, the amount of reallocated share that a non-diligent State receives is derived from its *pro rata* share of the liable States, not its fault level. If the reallocation of diligent States' shares is done on a *pro rata* basis in this way, the Panel reads the MSA as likewise meaning that a judgment reduction arising from some States' settlement of the diligent enforcement issue should be *pro rata* as well.

(Internal citations omitted).

13

Addressing the Non-Term Sheet States' objections, the Panel stated that the Partial Settlement Award and the Term Sheet "do not legally prejudice or adversely affect the [Non-Term Sheet] States." It continued:

> The Panel does not agree with the Objecting States' contention that all [Term Sheet] States must be treated as non-diligent for the purposes of the 2003 NPM Adjustment. There is no basis in the facts to assume that every [Term Sheet] State was non-diligent in 2003. Moreover, the Objecting States' position does not reflect any of the three standard methods of judgment reduction. Such an assumption would produce a considerably larger reduction in the [Non-Term Sheet] States' potential obligations than any of the standard methods. It is also contrary to the underlying principle of judgment reduction that, because a settlement is not tantamount to an admission of liability, settling defendants are not regarded as necessarily culpable or liable.
>
> The Objecting States argue that the MSA reallocation provisions must be wholly inapplicable to a State's share unless there is an actual determination that the State was diligent. They claim that any approach by which any State's share is otherwise subject to reallocation is an "amendment" to the MSA requiring their consent. But the MSA does not directly speak as to the process to be used when some States settle diligent enforcement and some do not. It is thus within the Panel's jurisdiction to interpret the contract in light of governing law to determine what the appropriate process and judgment reduction is where there is a partial settlement of diligent enforcement involving fewer than all of the States. There is thus no "amendment" to the MSA in the Panel doing so. Should any Objecting State, found by the Panel to be non-diligent, have a good faith belief that the *pro rata* deduction does not adequately compensate them for a [Term Sheet] State's removal from the re-allocation pool, their relief, if any, is by appeal to their individual MSA court. The cut-off date for interstate suits set forth in the Panel's "no contest" order, is not applicable to such procedure.

(Internal citation omitted).

On September 11, 2013, the Panel issued diligence rulings for the remaining 15 Non-Term Sheet States whose diligence had been contested by the PMs ("Final

Awards"). The Panel determined that six of those states, including Maryland, failed to diligently enforce their Qualifying Statutes.

In its Final Award for Maryland, the Panel began its analysis with "common" findings and conclusions for all States, including the general standard and specific factors that it had used to objectively assess the diligence of each contested State. The Panel explained that it had interpreted "diligent enforcement" to mean "an ongoing and intentional consideration of the requirements of a Settling State's Qualifying Statute, and a significant attempt by the Settling State to meet those requirements, taking into account a Settling State's competing laws and policies that may conflict with its MSA contractual obligations." "In order to objectively assess a Settling State's diligent enforcement in light of that definition," the Panel also considered a list of eight factors:

    a.     Collection Rate
    b.     Lawsuits Filed
    c.     Gathering Reliable Data
    d.     Resources Allocated to Enforcement
    e.     Preventing Non-Compliant NPMs from Future Sales
    f.     Legislation Enacted
    g.     Actions Short of Legislation
    h.     Efforts to be Aware of NAAG [National Association of Attorneys General] and Other States' Enforcement Efforts

Applying these factors "objectively" to assess Maryland's diligent enforcement, the Panel concluded that "Maryland failed to meet its burden of proof." According to the Panel, "Maryland did not exhibit a culture of compliance" for most of 2003, and its "efforts in 2003 actually fell short of its efforts in earlier years." As such, it ruled that Maryland was "subject to an NPM Adjustment pursuant to Section IX(d)(2)(B) of the [MSA]."

15

**C.    Circuit Court**

On March 26, 2013, following the Panel's issuance of the Partial Settlement Award but prior to its issuance of the Final Awards, Maryland filed a "Petition to Vacate Arbitration Award" in its MSA court, the Circuit Court for Baltimore City. In its petition, Maryland argued that the Partial Settlement Award "vastly exceed[ed] the scope of the Panel's power under the MSA, purport[ed] to alter the terms of the MSA without the concurrence of Maryland and other states, and fail[ed] to adhere to clear and undisputed contractual language." Acknowledging that "the full implications of the Partial [Settlement] Award [would] not be known until the arbitration is fully concluded," Maryland requested that the circuit court "enter an order setting the briefing and hearing schedule [as proposed by Maryland], or, in the alternative vacating the Partial [Settlement] Award without further argument."

On November 12, 2013, Maryland filed a "Motion to Compel a Maryland-Specific Arbitration on the Issue of Whether Maryland Diligently Enforced during 2004." In that request, Maryland averred that "[t]he MSA entitles the State to its own arbitration of the dispute over whether it diligently enforced" its Qualifying Statute in 2004. Furthermore, Maryland argued that "[a] State-specific arbitration would advance the fairness, efficiency, and other purposes of arbitration, while the only alternative to an individual arbitration, a multi-state arbitration, would defeat those same purposes."

Soon thereafter, on November 18, 2013, Maryland filed a "Petition to Vacate Arbitration Award Finding that [Maryland] Did Not Diligently Enforce its Qualifying Statute During 2003." In that petition, Maryland contended that "[t]he Panel's Final

16

Award must be vacated because the Panel refused to hear evidence material to the controversy."

Following a hearing on the motions on February 19, 2014, the circuit court entered a memorandum opinion and order on July 28, 2014, denying all three of Maryland's petitions. In reviewing the Panel's decisions, the court applied the vacatur standards of the FAA, which provide that "a reviewing court shall vacate an arbitration award, if the arbitrators exceeded their powers due to an error in their construction of the agreement; or the arbitrators were guilty of misconduct or misbehavior by which the rights of any party have been prejudiced."

With regard to the Panel's issuance of the Partial Settlement Award, the circuit court found:

> [T]he Partial Settlement Award and the NPM reallocation adjustment disputes do arise from the MSA; and are all clearly subject to the arbitration agreement and within the Panel's authority. Accordingly, this Court finds that the Panel did not lack jurisdiction, nor did it exceed its powers in interpreting the MSA and determining the appropriate method for reallocating the 2003 NPM Adjustment post-settlement.
>
> Further, this Court finds the Panel's conclusion of the *pro-rata* method to be based on a reasonable analysis of the MSA and review of applicable judgment-reduction principles of contract law . . . .
>
> While Maryland argues that the Panel disregarded the plain language of the MSA, this Court finds this argument to be without merit as the Panel did not and could not disregard the language of the MSA, as § IX(d)(2)(C)-(D) of the MSA is silent on the issue of the reallocation of the NPM Adjustment among non-settling states *where diligence is no longer contested due to settlement* . . . . This Court does not find any indication in the Panel's Award that the Panel was substituting its own notions of fairness and/or economic justice. Rather, the Panel was engaged in a good faith interpretation of the MSA and applicable law. Therefore, this Court finds that Maryland has failed to meet the requisite burden to establish that

17

the Panel, in issuing the Partial Settlement Award, engaged in misconduct by failing to construe the MSA or by substituting its own notion of fairness and/or economic justice . . . .

(Internal citations and footnotes omitted) (emphasis in original).

With regard to its denial of Maryland's request for a state-specific arbitration, the circuit court concluded that "the only reasonable interpretation of the MSA is that nationwide arbitration is required." The court explained that, under the text of the MSA's arbitration provision, the "two sides to the dispute" are "the MSA States in opposition to the downward adjustment, and the PMs." The circuit court also stated that "[t]he only way for the payment structure to remain 'nationwide and unitary,' as intended, is for the arbitration itself to be nationwide and unitary, since the diligence determinations made at the arbitration are directly tied to the reallocation provision." (Citing *Philip Morris, Inc.*, 179 Md. App. at 162) (footnote omitted).

Finally, with regard to the Panel's Final Award, the circuit court found that the Panel did not "refuse[] to hear pertinent and material evidence," as Maryland alleged, because "Maryland never requested the Panel to consider the comparative non-diligence of the contested 'term sheet states,'" nor did Maryland make "any substantive argument to the Panel that the Panel needed to consider the enforcement record of the 'term sheet states' when making diligence determinations for the non-settling states." The court also noted that Maryland's argument failed on the merits because "it [was] clear that the Panel's diligence determination focused on the objective standard and assessing diligence that was common to all states, and then applying that standard to each State's individual enforcement for 2003," instead of comparing Maryland with any other contested state.

18

(Emphasis and citation omitted). The court then concluded by noting that "[e]ven if some, most or all of the 'term sheet states' were less diligent than Maryland, from the facts there is no guarantee that the Panel would have found Maryland to be diligent."

Additional facts will be included as they become relevant to our discussion, below.

## IV. STANDARD OF REVIEW

At the outset, we must determine the applicable standard of review in a case such as this, where the Panel issued an award in an arbitration governed by the United States Federal Arbitration Act ("FAA") – as mandated by the MSA – but directed aggrieved parties to appeal to their respective state courts.

Maryland contends that "the standard of review is governed by Maryland law and is *de novo*." Although Maryland acknowledges that this Court may rely on decisions interpreting the FAA because the Maryland Uniform Arbitration Act ("MUAA") is the FAA's state analogue, Maryland maintains that we are not bound by the federal procedural provisions of the FAA. Instead, Maryland avers that this Court must look to the pertinent state law relating to arbitration agreements to determine whether the circuit court erred in denying the relief sought.

In response, the PMs argue that the circuit court correctly applied "the FAA's extremely narrow judicial-review standards," and that Maryland's claim that a *de novo* standard applies is "both waived and wrong." First, the PMs contend that "Maryland waived [its] argument by not raising it below." Specifically, the PMs note that Maryland "repeatedly acknowledged that the MSA requires application of the FAA" through its opening and subsequent briefs, and its post-hearing submission. Second, relying on the

19

MSA, the PMs aver that "the FAA will 'govern' MSA arbitrations" and, thus, the circuit court acted properly in applying the vacatur standards of the FAA. Third, the PMs argue that "to the extent . . . that Maryland law would authorize broader judicial review in this case, it would be *preempted* by the FAA." (Emphasis in original). Lastly, the PMs contend that "the Maryland standard of review is equally or nearly as narrow as the FAA standard," and its application would not, therefore, lead to a different result.

We agree with Maryland that judicial review of the arbitrator's decision in this case is governed by Maryland law. We explain and address each of the PMs' contentions.

The PMs first argue that Maryland waived its present claim by not raising it in the circuit court, but they cite no authority to support their position that the applicable standard of review can be waived. Indeed, although no Maryland court has ruled on this matter, several federal courts have stated that "a party cannot 'waive' the proper standard of review by failing to argue it." *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008) (citations omitted); *see also Ward v. Stephens*, 777 F.3d 250, 257 n.3 (5th Cir. 2015) ("A party cannot waive, concede, or abandon the applicable standard of review.") (Citations omitted), *petition for cert. filed*, U.S. No. 14-10033 (June 2, 2015); *Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) (holding that "the standard of review under AEDPA cannot be waived by the parties") (citations omitted); *Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1022 n.4 (9th Cir. 1997) (*en banc*) (O'Scannlain, J., concurring in part and dissenting in part) ("[A] party cannot, by waiver or estoppel, change the applicable standard of review."); *Ingle v. Metro. Life Ins. Co.*, 947 F. Supp. 2d 1163, 1167 (N.D.

20

Okla. 2013) (citing *Izzarelli v. Rexene Products Co.*, 24 F.3d 1506, 1519 (5th Cir. 1994), and stating that "at least one circuit court has explicitly held that a party cannot waive the standard of review in an ERISA case").  This is because it is "the court, not the parties, [who] must determine the standard of review[.]"  *Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001) (citation omitted).  Therefore, "[s]uch a determination remains for this court to make for itself."  *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996).[6]

Next, citing the MSA, the PMs argue that judicial review of the Panel's decision is governed by the FAA.  In advancing this argument, the PMs correctly note that, pursuant to MSA § XI(c), NPM Adjustment disputes are subject to an "*arbitration* [that] 'shall be governed by the [FAA].'"  (Emphasis added).  But, they fail to acknowledge that the MSA does not mandate that *judicial review* of such an arbitration award would be governed by the FAA as well.  Rather MSA § XVIII(n), entitled "Governing Law," provides that the MSA "shall be governed by the laws of the relevant Settling State, without regard to conflict of law rules of such Settling State."  *See also* MSA § VII(a) (stating that the MSA Court retains exclusive jurisdiction); and MSA § II(p) (defining "Court" as the "respective court in each Settling State").

---

[6] Even if the standard were waivable, this Court could exercise its discretion to entertain Maryland's argument.  Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but *the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal*.") (Emphasis added).

Alternatively, the PMs contend that "the FAA standard would govern under constitutional preemption principles" because applying a broader state law review standard "would undercut the FAA's national policy favoring arbitration with just [a] limited review" and "would thwart the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms."  (Citations omitted).  Contrary to the PMs' contention, however, the Maryland Court of Appeals has repeatedly stated that "our procedural rules are not preempted by national policy favoring arbitration[.]" *Addison v. Lochearn Nursing Home, LLC*, 411 Md. 251, 287 (2009) (citing *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 242 (2001) ("we conclude that Maryland procedural law . . . is not preempted by the FAA"); *accord Walther v. Sovereign Bank*, 386 Md. 412, 423 (2005) ("In enforcing . . . the FAA, however, state courts are not bound by the federal procedural provisions of the FAA . . . but may generally apply their own procedures.").[7]  In fact, the United States Supreme Court has stated that "[t]he FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration."  *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989) (citation omitted).  Instead, "state law may . . . be pre-empted to the extent that it actually conflicts

---

[7] We likewise reject the PMs' contention, based on the Missouri Court of Appeals's decision in *Edward D. Jones & Co. v. Schwartz*, 969 S.W.2d 788 (Mo. Ct. App. 1998), that the matter at hand is "substantive rather than procedural."  Although the Court in that case acknowledged that the FAA "create[d] a body of substantive federal law on arbitration[,]" it nonetheless "utilize[d] Missouri procedural rules" while "apply[ing] federal substantive law" in a case involving arbitration pursuant to the FAA.  *Id.* at 793, 795.

22

with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Therefore, in order for the PMs to prevail on their argument, it must be evident that application of the Maryland standard of review would not only serve to frustrate the underlying goals of the FAA, but would also result in a failure to carry out the arbitration provision of the MSA as the parties had intended. Application of the Maryland standard of review does neither. As the PMs recognize in their briefs and as we shall further explain below, "[t]he Maryland arbitration statute is virtually identical in substance to the FAA," and would also promote the goal of enforcing arbitration agreements. (Citation omitted). *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 590 (2008) ("The FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable."). And, with regard to the terms of the parties' agreement to arbitrate, we have already explained that application of Maryland law would not violate any MSA provision governing post-arbitration judicial review.

Having determined that Maryland standard of review applies in reviewing the Panel's decisions, we direct our attention to the applicable statute governing the vacation of an arbitration award, Md. Code (1973, 2013 Repl. Vol.), § 3-224(b) of the Courts & Judicial Proceedings Article ("CJP"), which provides:

The court shall vacate an award if:

23

(1) An award was procured by corruption, fraud, or other undue means;

(2) There was evident partiality by an arbitrator appointed as a neutral, corruption in any arbitrator, or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers;

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown for the postponement, refused to hear evidence material to the controversy, or otherwise so conducted the hearing, contrary to the provisions of § 3-213 of this subtitle, as to prejudice substantially the rights of a party; or

(5) There was no arbitration agreement as described in § 3-206 of this subtitle, the issue was not adversely determined in proceedings under § 3-208 of this subtitle, and the party did not participate in the arbitration hearing without raising the objection.

Here, Maryland's issues with the Panel's decisions are rooted in CJP § 3-224(b)(3) & (4).

In the past, Maryland courts have held that "arbitrators exceed their powers not only when the substance of their award lacks a scintilla of rationality, but also where the award is founded upon a mistaken assertion of jurisdiction." *Snyder v. Berliner Const. Co.*, 79 Md. App. 29, 37 (1989) (citation & footnote omitted); *see also Downey v. Sharp*, 428 Md. 249, 258 (2012) (noting that "awards which were 'completely irrational,' or which demonstrated 'manifest disregard of the law,' or which were contrary to the State's public policy, had been overturned"). Thus, "'an award issued by an arbitration panel acting without jurisdiction should be accorded no deference at all on appeal.'" *Snyder*, 79 Md. App. at 38 (quoting *Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.*, 313 Md. 652, 664 (1988)).

By contrast, "factual findings by an arbitrator are virtually immune from challenge and decisions on issues of law are reviewed using a deferential standard on the far side of the spectrum away from a usual, expansive *de novo* standard." *Mandl v. Bailey*, 159 Md. App. 64, 92 (2004) (citations omitted); *see also Downey*, 428 Md. at 266 ("reviewing courts generally defer to the arbitrator's findings of fact and applications of law" ) (citations omitted).  As a result, "courts are fairly reluctant to disturb the award of an arbitrator where the award reflects the honest decision of the arbitrator and is the product of a full and fair hearing of the parties." *Balt. Teachers Union, Am. Fed'n of Teachers, Local 340, AFL-CIO v. Mayor & City Council of Balt.*, 108 Md. App. 167, 181 (1996) (citations omitted).

With regard to the appellate process, the parties do not dispute – and we agree – that this Court's review of the circuit court's decision is *de novo*, regardless of whether the circuit court disposed of the outstanding motions before it pursuant to the FAA or the MUAA.  *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947-48 (1995) ("when reviewing a district court decision that refuses to vacate, or confirms, an arbitration award," a court of appeals should "accept[] findings of fact that are not 'clearly erroneous' but decid[e] questions of law *de novo*") (internal citations omitted); *Delta Queen Steamboat Co. v. Dist. 2 Marine Engineers Beneficial Ass'n, AFL-CIO*, 889 F.2d 599, 602 (5th Cir. 1989) ("Thus, since this jurisdictional challenge focuses upon whether the award is grounded in the . . . agreement, we will review the [trial] court's decision *de novo*.") (Citation omitted); *Stephen L. Messersmith, Inc.*, 313 Md. at 664 ("the appropriate standard of review when an arbitration award is attacked for lack of

jurisdiction . . . is . . . *de novo*"); *Prince George's Cnty., Md. ex rel. Prince George's Cnty. Police Dep't v. Prince Georges Cnty. Police Civilian Employees Ass'n*, 219 Md. App. 108, 119 (2014) ("A circuit court's decision to grant or deny a petition to vacate or confirm an arbitration award is akin to an order granting or denying a motion for summary judgment. The standard of review is *de novo*.") (Internal citations omitted), *cert. granted*, 441 Md. 217 (2015). "Therefore, we review that court's disposition for legal error." *Montgomery Cnty., Maryland v. Fraternal Order of Police, Montgomery Cnty. Lodge 35, Inc.*, 427 Md. 561, 572 (2012) (citation omitted). To that end, we accept any relevant factual findings by the circuit court that are not "clearly erroneous[.]" *See First Options of Chicago, Inc.*, 514 U.S. at 947-48.

## V. DISCUSSION

### A.    Partial Settlement Award

Maryland first argues that "the Panel exceeded its powers when it amended the MSA without Maryland's consent," by ratifying the Term Sheet and by issuing the Partial Settlement Award. According to Maryland, the Partial Settlement Award "impermissibly allowed the contested Term Sheet States to bypass a diligence inquiry and treated them as not subject to the NPM Adjustment." Maryland further contends that, in ruling as it did, the Panel's actions "conflicted with rules of conduct and ethics for arbitrators" and "detrimentally affected Maryland." Accordingly, Maryland argues that the circuit court erred in refusing to vacate the Partial Settlement Award, and it now urges us to reverse that judgment and remand with instructions to have the Independent Auditor "treat all of

26

the Term Sheet States [whose diligence was contested] as non-diligent for the purpose of calculating Maryland's NPM Adjustment liability for 2003."[8]

In response, the PMs aver that "the circuit court correctly held that the Panel did not exceed its powers in entering the [Partial] Settlement Award's *pro rata* judgment-reduction ruling," and its decision "furthered the strong policy in favor of settlements." According to the PMs, the court acted properly in applying the FAA standard and finding that the Panel not only had jurisdiction to interpret the MSA, but also acted in good faith in issuing the Partial Settlement Award.[9] Alternatively, the PMs contend that, even when reviewed under Maryland's standard, "the Panel's *pro rata* judgment-reduction ruling was also a rational interpretation of the MSA." In that regard, the PMs argue that "MSA § IX(d)(2) simply does not say what [Maryland] alleges[;]" rather, they insist that the Panel's interpretation was warranted because "§ IX(d)(2) does not 'directly speak' to, and is indeed 'silent on,' the proper method for reallocating the NPM Adjustment after a partial settlement." Finally, the PMs contend that Maryland waived its argument because it vehemently opposed the Panel's adoption of the proportionate fault judgment-reduction

---

[8] In its reply brief, Maryland notes that *Com. ex rel. Kane*, *supra*, 114 A.3d 37, is "the only appellate ruling on point," and that the Commonwealth Court of Pennsylvania, in that case, correctly "affirmed a ruling by a Pennsylvania trial court that had vacated the Partial [Settlement] Award as to Pennsylvania and directed that the contested Term Sheet States be deemed non-diligent for purposes of calculating Pennsylvania's NPM Adjustment obligation."

[9] As we previously explained, the FAA's vacatur standards do not apply here. Therefore, we need not address this argument.

27

method, which would have allowed the Panel to conduct diligence hearings for any Term Sheet States.

In its reply brief, Maryland argues that the PMs' argument "begins at the wrong place." We agree. As Maryland stated, in pertinent part:

> The [PMs'] argument takes as its starting point a presumption that the Panel was confronted with a need to fashion an appropriate method of judgment reduction due to an absence of guidance from the MSA. Leaping from that faulty premise, they would ask this Court to determine that the Panel's choice of a *pro rata* methodology was, in that context, a rational one. However, the issue raised in this appeal is not whether the Panel made the appropriate selection among available judgment reduction methodologies, but whether it was empowered to look outside the MSA to find a judgment reduction methodology at all.

(Internal citations omitted). Our analysis begins with the MSA.

MSA § XI(c) provides that "[a]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor . . . shall be submitted to binding arbitration before a panel of three neutral arbitrators" in an arbitration governed by the FAA. The Supreme Court has stated that, in order "[t]o resolve disputes about the application of a[n] . . . agreement, an arbitrator must find facts" and is free to "interpret[] . . . the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Moreover, when "'parties . . . attempt to settle an issue, otherwise arbitrable, by agreement, any disagreement as to the existence or effect of that settlement agreement would itself be a matter for the arbitrator to decide.'" *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. TriMas Corp.*, 531 F.3d 531, 538-39 (7th Cir. 2008) (quoting *Employees Protective Ass'n v. Norfolk & Western Rwy. Co.*, 571 F.2d 185, 193 (4th Cir.

28

1977)); *see also Shaw's Supermarkets, Inc. v. United Food & Commercial Workers Union, Local 791, AFL-CIO*, 321 F.3d 251, 254 (1st Cir. 2003) (stating that, when parties enter into a valid agreement to arbitrate, "other issues relating to the substance of the dispute or the procedures of arbitration are for the arbitrator") (citation omitted).[10] Therefore, the circuit court did not err in concluding that "the Panel did not lack jurisdiction . . . in interpreting the MSA and determining the appropriate method for reallocating the 2003 NPM Adjustment post-settlement."

Where the Panel erred, however, was in reallocating the 2003 NPM Adjustment post-settlement without *first* determining the diligence of certain states. Stated differently, by ratifying the Proposed Stipulated Partial Award and issuing the Partial Settlement Award, the Panel disregarded MSA § IX(d)(2)(B), which provides that "[a] Settling State's Allocated Payment shall not be subject to a NPM Adjustment . . . if such Settling State continuously had a Qualifying Statute . . . *and diligently enforced* the provisions of such statute during such entire calendar year." (Emphasis added). The Supreme Court has stated that an "arbitrator may not ignore the plain language of the contract." *United Paperworkers Int'l Union, AFL-CIO*, 484 U.S. at 38 (citation omitted). But, in this case, certain Term Sheet States' Allocated Payments were deemed not subject to an NPM Adjustment even though the Panel never found that such states diligently enforced their respective Qualifying Statutes. As such, the Panel's error did not lie

---

[10] Because the MSA provided that the arbitration would be governed by the FAA, we look to federal cases to delineate the scope of the Panel's jurisdiction in carrying out said arbitration. As previously explained, however, the Panel's rulings are subject to Maryland's vacatur standards on judicial review.

simply in reallocating the 2003 NPM Adjustment and in doing so according to the *pro rata* method of judgment reduction;[11] its error was in doing both before determining the diligence of all contested states.[12]

We agree with the Commonwealth Court of Pennsylvania that "[a]lthough the MSA does not address the effect of a partial settlement on the reallocation, it is not ambiguous." *Com. ex rel. Kane*, 114 A.3d at 62. Indeed, the PMs' main contention is not that the MSA was ambiguous; rather, they argue in large part that the Panel properly issued the Partial Settlement Award because the MSA was silent on how to reallocate the NPM Adjustment "where only some parties settle and consent." We have previously recognized, however, that "[a] contract's silence on a particular issue does not, by itself, create ambiguity as a matter of law." *Azat v. Farruggio*, 162 Md. App. 539, 551 (2005) (citing Richard A. Lord, *Williston on Contracts*, § 30.4 at 47-51 (4th ed. 1999)). Silence creates ambiguity only "when it involves a matter naturally within the scope of the contract." *Id.* (citation omitted). Here, although the MSA was silent on the effect of a partial settlement regarding the NPM Adjustment, that settlement – or Term Sheet – was not a matter naturally within the scope of the MSA and, thus, did not create an ambiguity. As such, the Panel was not empowered to bypass the diligence determination in reallocating the NPM Adjustment. *See Com. ex rel. Kane*, 114 A.3d at 63 ("Regardless

---

[11] Therefore, it matters not that Maryland opposed the Panel's adoption of the proportionate fault method of judgment reduction.

[12] We reach this conclusion regardless of which ethical standards the parties deem appropriate in this instance.

30

of who bore the burden, relief from the NPM Adjustment and Reallocation Provision depended on a determination of diligence.").

Likewise, the Panel erred in concluding: "Where multiple parties have a potential shared contractual obligation and some of them settle and some do not, the non-settling parties cannot necessarily block the settlement." Although "[t]he general rule . . . is that a non-settling party does not have standing to object to a settlement between other parties," as the Panel noted, that rule cannot apply in cases such as this, where the settlement (*i.e.*, Term Sheet) went against the provisions of an underlying agreement (*i.e.*, MSA) involving both the settling and non-settling parties (*i.e.*, Term Sheet and Non-Term Sheet States, respectively). By issuing the Partial Settlement Award, the Panel violated MSA § XVIII(j), which governs "Amendment and Waiver," and states:

> This Agreement may be amended by a written instrument executed by all Participating Manufacturers affected by the amendment and by all Settling States affected by the amendment. The terms of any such amendment shall not be enforceable in any Settling State that is not a signatory to such amendment. The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving party or parties. The waiver by any party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other party.

As Maryland correctly notes, the Panel's Partial Settlement Award "imposed an unauthorized amendment to the MSA by changing the MSA's method for reallocating the NPM Adjustment among states that did not prove their diligence." *See Com. ex rel. Kane*, 114 A.3d at 63 ("By treating the Term Sheet States as diligent and allowing them to shift their share of the reallocation, the panel departed from the MSA's clear terms and

31

'amended' the MSA without agreement of 'all' parties 'affected by the amendment.'"). Accordingly, the Panel erred in concluding that the Partial Settlement Award and the Term Sheet "do not legally prejudice or adversely affect" the Non-Term Sheet States. And, we need not engage in speculation as to how much Maryland stands to gain or lose to determine that it and the other non-diligent, Non-Term Sheet States were adversely affected by the Panel's ruling.

The PMs place great weight on the fact that no Settling State contested the diligence of other Settling States. Their argument, however, is flawed because it assumes that a Term Sheet State whose diligence had been contested by another Settling State would have benefited by a diligence determination by the Panel. But, we do not know whether such Term Sheet State would have been found diligent, as was the case with Term Sheet States whose diligence was contested by the PMs, but were deemed not subject to the 2003 NPM Adjustment.

In sum, the Panel exceeded its powers, in violation of CJP § 3-224(b)(3), when it reallocated the 2003 NPM Adjustment without first determining the diligence of all contested states. Not only did the Panel lack jurisdiction to issue the Partial Settlement Award pursuant to MSA § XVIII(j), its decision lacked rationality in light of MSA § IX(d)(2)(B). In turn, the circuit court erred in affirming the Panel's ruling.

In order to bring the Partial Settlement Award in line with the MSA, we now grant Maryland's request and reverse the circuit court's denial of Maryland's Petition to Vacate Arbitration Award. We remand the case to the circuit court so that it may vacate the Partial Settlement Award and instruct the Independent Auditor to treat the 20 Term Sheet

32

States, whose diligence was contested but not determined,[13] as non-diligent, when reallocating the 2003 NPM Adjustment. As Maryland states, "given that the arbitration was closed," this is "the only possible remedy at this point."

## B.     Evidentiary Hearing

Next, Maryland argues that "the Panel's Final Award should be vacated because the Panel's refusal to hear material evidence deprived Maryland of a full and fair hearing." Specifically, Maryland avers that in implementing the Partial Settlement Award, the Panel "refus[ed] to allow Maryland and other states to put at issue the diligence of the contested Term Sheet States," but later "considered the evidence regarding all of the states for which it made diligence determinations when the Panel rendered its [diligence] decisions." Acknowledging that it did not advocate comparative diligence determinations nor attempt to introduce evidence regarding the diligence of other states, Maryland contends that "once the Panel [decided] to engage in a comparative analysis, and actually did so in the context of an arbitration governed by the ARA, it was improper – and beyond any legitimate justification – for the Panel to refuse to hear material evidence regarding the contested Term Sheet States." As such, Maryland argues that the circuit court erred failing to vacate the Final Award.

In response, the PMs argue that the circuit court correctly held that the Panel did not commit evidentiary misconduct and properly refused to vacate the Final Award. In making their argument, the PMs emphasize that: (1) "Maryland never requested, and

---

[13] To be clear, this includes Settling States that signed the Term Sheet except those whose diligence was not contested or those that were found by the Panel to be diligent.

actively opposed, [a] comparative state analysis;" (2) the Panel found Maryland to be non-diligent "based solely on an objective analysis of state-specific circumstances" and "not on a relative analysis that compared [Maryland] against other contested states;" and (3) Maryland fails to demonstrate that any prejudice occurred as a result of the Panel's alleged error. Applying the vacatur standards of the FAA, the PMs assert that the circuit court properly denied Maryland's Petition to Vacate Arbitration Award Finding that [Maryland] Did Not Diligently Enforce its Qualifying Statute During 2003.

Following the motions hearing in this case, the circuit court found that the Panel did not refuse to hear pertinent and material evidence as Maryland alleged. In pertinent part, the court reasoned that Maryland never requested the Panel to consider the enforcement record of all contested Term Sheet States; that the Panel's diligence determination focused on the objective standard; and that "[e]ven if some, most or all of the 'term sheet states' were less diligent than Maryland, from the facts there is no guarantee that the Panel would have found Maryland to be diligent."

Although the circuit court erred in applying the FAA's vacatur standards in issuing its ruling, we ultimately reach the same conclusion after applying the Maryland standard of review. Initially, we note that, as we are remanding the case with instructions for the Independent Auditor to consider all contested Term Sheet States as non-diligent, Maryland will already receive part of the relief it seeks when the 2003 NPM Adjustment is reallocated among a larger number of non-diligent states. But, to the extent that Maryland challenges the Panel's finding that Maryland was not diligent in enforcing its

Qualifying Statute, we perceive no error on the Panel's part and, accordingly, affirm the circuit court's judgment.

As previously mentioned, CJP § 3-224(b)(4) authorizes courts to vacate an arbitral award when the arbitrators "refused to hear evidence material to the controversy . . . as to prejudice substantially the rights of a party." "The party challenging the arbitration award bears the burden of proving the existence of one of the grounds for vacating it." *Mandl*, *supra*, 159 Md. App. at 86 (citations omitted). The question we must address on appeal, then, is whether, on the facts, the Panel "as a matter of law improperly refused to hear evidence material to the parties' controversy, to the substantial prejudice of [Maryland's] rights." *Id.* at 91-92 (citing CJP § 3-224(b)(4)).

Citing the ARA and the Panel's July 1, 2011 order regarding burden of proof, Maryland contends that "[t]he Panel's failure to hear the contested Term Sheet States' enforcement records violated the Panel's own prior orders and Maryland's legitimate contract expectations." In particular, Maryland looks to the Panel's statement that "'the reallocation provisions of the MSA do not apply unless and until diligent enforcement determinations are made for those states *whose diligence is contested by either the [PMs] or the states*,'" (emphasis added by Maryland), as well as the following ARA provision:

> The Arbitration panel shall not disclose or otherwise make known its determinations as to whether any Settling State diligently enforced a Qualifying Statute during 2003 until after the conclusion of *the presentation of all evidence* and written or oral argument in the Arbitration proceeding with respect to the diligent enforcement of *all Settling States that join the arbitration* by the date that the third arbitrator is selected and whose diligent enforcement the Signatory PMs contested in the Arbitration . . . .

35

ARA § 2(i) (emphasis added by Maryland).

Maryland's reliance on those statements, however, is misplaced because in issuing the Partial Settlement Award, the Panel believed (albeit mistakenly) that diligent enforcement determinations had already been made for all contested states. More importantly, those statements do not provide support for Maryland's assertion that "once the Panel [decided] to engage in a comparative analysis, . . . it was improper . . . for the Panel to refuse to hear material evidence regarding the contested Term Sheet States." Nothing in the record reflects that the parties to the ARA and the Panel agreed to employ a comparative method in determining each state's diligence; nor does Maryland point to any case law to indicate that such was the proper procedure.

Overall, Maryland failed to meet its burden of proving that the Panel refused to hear evidence material to the controversy, to the substantial prejudice of Maryland's rights, when the Panel found that Maryland was not diligent in enforcing its Qualifying Statute. We agree with the circuit court that "the Panel's diligence determination focused on the objective standard and assessing diligence that was common to all states, and then applying that standard to each State's individual enforcement for 2003." It was not irrational for the Panel to do so. *See Downey*, *supra*, 428 Md. at 258; *Snyder*, *supra*, 79 Md. App. at 37. As the Panel explained in its Final Award for Maryland, "[i]t is . . . not a useful exercise, or even valid, to compare the decision as to one State against the decision as to another" because the Panel considered the various factors relating to diligence "in the over-all [sic] context of a Settling State's existing policies and circumstances in 2003."

36

Furthermore, based on the record, there was enough evidence to support the Panel's finding of non-diligence on Maryland's part. Assessing Maryland based on the eight relevant factors, the Panel first noted that Maryland's collection rate of 47% for 2003 was less than its rates in the year before (75.4%) and after (55.3%). Second, the Panel stated that although "[e]scrow was not paid on 68.2 million NPM cigarettes sold in 2002" and "Maryland identified lawsuits as being an important part of the enforcement effort," it "filed only one lawsuit in 2003." Third, with regard to gathering reliable data, the Panel found that Maryland "received little help and insufficient sales data from the Comptroller's Office, which basically was a non-participant in enforcement efforts." Fourth, the Panel determined that "Maryland's enforcement efforts were seriously hampered by lack of sufficient[ly] committed and trained personnel." Fifth, the Panel noted that although Maryland may have been well-positioned for diligent enforcement in 2004, its efforts were "not enough to credit Maryland for an 'ongoing and intentional consideration of the requirements of a State's Qualifying Statute.'" Sixth, the Panel recognized that "[a]lthough Maryland passed its Qualifying Statute and Complementary Legislation in a timely manner, it did little to implement it until . . . toward the end of 2003." Seventh, the Panel concluded that Maryland's record in the area of "Actions Short of Legislation" was "extremely poor." For example, "it conducted no desk or field audits," "conducted retail inspections for state excise tax but none for escrow compliance," and "sent notice letters, but only two demand letters were sent to non-compliant NPMs." Lastly, the Panel found "little, if any, information" about the eighth factor, "Efforts to be Aware of NAAG and Other States' Enforcement Efforts." As

37

"factual findings by an arbitrator are virtually immune from challenge," *Mandl*, 159 Md. App. at 92, we cannot say that the circuit court erred in refusing to vacate the Panel's finding of non-diligence.

Finally, we agree with the circuit court that "[e]ven if some, most or all of the 'term sheet states' were less diligent than Maryland, from the facts there is no guarantee that the Panel would have found Maryland to be diligent." As the PMs state in their brief, Maryland "failed to identify adequate evidence that it would have benefited from a comparison to the contested [Term Sheet] States," because the most that Maryland can assert is that "some 'evidence . . . suggests that the contested [Term Sheet] States would not have compared favorably.'" The use of such conclusory statements, however, is inadequate to show substantial prejudice. *See, e.g., Owens-Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 525 (1996) (stating that "conclusory allegations" of prejudice are "certainly not sufficient"); *Forensic Advisors, Inc. v. Matrixx Initiatives, Inc.*, 170 Md. App. 520, 530 (2006) (stating that "a particular and specific demonstration of fact, as distinguished from general, conclusory statements," is necessary to reveal "some injustice, prejudice, or consequential harm") (citation omitted); *Gen. Acc. Ins. Co. v. Scott*, 107 Md. App. 603, 616 (1996) (stating that "conclusory allegations" are "insufficient, as a matter of law, to raise a genuine dispute as to whether [a party] suffered actual prejudice").

## C.    State-Specific Arbitration

Finally, Maryland argues that the circuit court erred in denying Maryland's motion to compel state-specific arbitration. First, Maryland contends that pursuant to the plain

meaning of the MSA, Maryland, by itself, constitutes a single "side" to the dispute to be submitted to arbitration, "with at least the [PMs], and perhaps other states, on the other side."[14] Next, Maryland avers that "[n]othing in . . . the MSA's arbitration clause, or any other provision of the MSA, can reasonably be read to require [a multi-state arbitration]." Similarly, Maryland argues that although this Court, in *Philip Morris Inc.*, *supra*, 179 Md. App. 140, held that Maryland must arbitrate the dispute over the 2003 NPM Adjustment, we did not decide "whether [Maryland] was required to arbitrate that dispute in a multi-state proceeding." Lastly, Maryland contends that "the public interest supports a Maryland-specific arbitration" as it would "ensur[e] that a panel of arbitrators could give their attention to Maryland's enforcement of [its] statute" and "Maryland's interest in defending its practices would no longer be frustrated by the need to compromise with other states that have different interests."

In response, the PMs contend that the circuit court acted properly in denying Maryland's motion for a state-specific arbitration. According to the PMs, "this Court in Philip Morris . . . already decided that the MSA requires NPM Adjustment disputes . . . to

---

[14] As previously mentioned, MSA § XI(c) provides, in pertinent part:

Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor . . . shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the *two sides* to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator.

(Emphasis added).

be arbitrated in a nationwide arbitration." In addition, the PMs argue that "the MSA's text, its structure, and extensive, uniform authority from other [jurisdictions] . . . all confirm the trial court's decision." Lastly, the PMs aver that Maryland's policy argument is "irrelevant and meritless" because it does not explain how "the myriad proceedings necessary to determine the diligence of each of the other 27 States would function more equitably than a nationwide arbitration." We agree with the PMs.

In *Philip Morris, Inc.*, 179 Md. App. at 162-63, we determined that the structure of the MSA requires arbitration due, in part, to the "[n]eed for uniformity:"

> The State contends that "[a] nationwide arbitration concerning the diligence of [fifty-two] states and territories in enforcing their own laws might well represent the ultimate in 'chaos.'"

> The State, however, cannot explain how a proceeding that is subject to one final and binding determination would be less workable or expeditious than litigating the issue fifty-two times in fifty-two separate court systems with the imminent possibility of delays and appeals.

> The MSA's payment structure is nationwide and unitary. The independent auditor calculates and determines the participating manufacturers' annual payments and then allocates those funds among the settling states. In the case of diligent enforcement, a single decision-maker is vitally important because the determination for one state affects every other settling state pursuant to § IX(d)(2)(C)'s "reallocation" provision.

> The question of diligent enforcement cannot be made in a vacuum. We concur with the numerous jurisdictions that have held that the present dispute must be resolved under one clear set of rules that apply with equal force to every settling state. We find the rationale of the Superior Court of Connecticut particularly compelling:

>> The problem is even more acute, however, when the resolution of a dispute as to calculations and determinations by the Independent Auditor will necessarily have different effects on different Settling States. Unless such disputes are presented to and decided by tribunals that have the power to

40

> hear from and bind each affected Settling State as a party, great mischief can be done and substantial unfairness can result. Where, for example, as in this case, it is claimed that an individual Settling State is exempt from the NPM Adjustment for a given year because it diligently enforced a Model Statute that was in full force and effect throughout that year, the decision of the tribunal deciding that issue will not only affect the interests of the Settling State seeking to qualify for the exemption, but those of all other Settling States as well. This is so because the granting of an exemption to one Settling State will inexorably lead to the reallocation of its allocated portion of the NPM Adjustment to all other non-exempt Settling States. Each Settling State thus has a vital interest in the granting or denial of each other Settling State's individual claim for exemption, and for obvious reasons, their interests are conflicting. Submitting such a dispute to a neutral panel of competent arbitrators affords all interested parties the right to be heard on a level playing field where no interested party enjoys an apparent home-field advantage.

*Connecticut v. Philip Morris, Inc.*, 279 Conn. 785, 905 A.2d 42, 50-51 (2006) . . . .

Although Maryland is correct that this Court's original opinion included language that more definitively supported a requirement that Maryland participate in multi-state arbitration, and that such language was removed pursuant to Maryland's motion to reconsider, the final version of our opinion clearly still contemplated a single, nationwide arbitration.[15] To the extent that we previously did not hold as such, we do so now.

First, there is no merit to Maryland's argument that, when considering the terms of the MSA, Maryland constitutes a single "side" to the dispute to be submitted to arbitration, "with at least the [PMs], and perhaps other states, on the other side." When

---

[15] We originally filed our opinion in *Philip Morris, Inc.* on February 1, 2008, and filed the final version on March 27, 2008.

the Panel convened to hear this matter, the parties agreed that the dispute centered on whether the PMs were entitled to the 2003 NPM Adjustment. Particularly, "the participating manufacturers requested that the auditor apply the 2003 NPM Adjustment to their April 2006 payments. Maryland and the other settling states, however, urged the auditor to deny the NPM Adjustment on the ground that the settling states 'diligently enforced' their qualifying statutes." *Philip Morris Inc.*, 179 Md. App. at 148. Thus, the circuit court correctly recognized the "two sides to the dispute" to be "the MSA States in opposition to the downward adjustment, and the PMs."

Next, in addition to our previous determination that having "a single decision-maker is vitally important" in light of the MSA's "nationwide and unitary" payment structure, *id.* at 162, Maryland's proposed state-specific arbitration would not necessarily advance the public interest. As the PMs point out, "every State would have an interest in the decision on diligence for every other state" and in each state-specific proceeding, "up to 27 other States would need to intervene to protect their interest, which would multiply exponentially the cost, complexity, and burden of resolving the 2004 NPM Adjustment dispute." This would have a tremendous effect on all parties, especially the SPMs, which are smaller companies with more limited resources.

Lastly, our holding is supported by courts in other jurisdictions. *See McGraw v. Am. Tobacco Co.*, 681 S.E.2d 96, 112 (W. Va. 2009) ("All courts addressing arguments . . . against the requirement of a single, nationwide arbitration of the diligent enforcement determination have consistently and logically rejected the same. Both the structure and plain meaning of the MSA require a uniform determination of this issue due to the impact

42

the determination relevant to one settling state will have upon all other settling states.");

*State, ex rel. Carter v. Philip Morris Tobacco Co.*, 879 N.E.2d 1212, 1220 (Ind. Ct. App. 2008) ("Both the language and the structure of the MSA require that the dispute concerning the 2003 NPM Adjustment, including the Settling States' claims of diligent enforcement of their Qualifying Statutes, must be submitted to a single, national arbitration panel."); *State ex rel. Riley v. Lorillard Tobacco Co.*, 1 So. 3d 1, 14 (Ala. 2008) ("we conclude that the agreement requires a national, as opposed to a local, arbitration proceeding"); *State v. Philip Morris USA Inc.*, 945 A.2d 887, 894 (Vt. 2008) ("Other courts addressing this issue, however, have found 'compelling logic' in having disputes over diligent enforcement handled by one arbitration panel rather than separate courts in each settling state . . . . We agree.") (Citation omitted); *State v. Phillip Morris, Inc.*, 905 A.2d 42, 51 n.12 (Conn. 2006) (noting that the language of the MSA "envisions that the settling states would select one arbitrator and the participating manufacturers would select one arbitrator") (citation omitted); *State of N.M. ex rel. N.M. Attorney Gen. Gary K. King*, 194 P.3d 749, 755 (N.M. Ct. App. 2008) (affirming an order "compelling arbitration before a single, nationwide arbitration panel"); *State v. Philip Morris Inc.*, 858 N.Y.S.2d 134 (N.Y. App. Div. 2008) ("This Court rejected . . . arguments that each Settling State constituted a 'side' to the dispute, under section XI (c) of the Master Settlement Agreement, with the right to select its own arbitrator") (citation omitted); *People v. Lorillard Tobacco Co.*, 865 N.E.2d 546, 554 (Ill. App. Ct. 2007) ("Moreover, we agree with those courts before us that have pointed out the 'compelling logic to having these disputes handled by a single arbitration panel of three federal judges, rather

43

than numerous state and territorial courts.'") (Citation omitted).  Accordingly, the circuit court did not err in denying Maryland's motion to compel a state-specific arbitration.

## VI. CONCLUSION

For all of the foregoing reasons, we reverse the circuit court's denial of Maryland's Petition to Vacate Arbitration, and affirm its denial of Maryland's Motion to Compel a Maryland-Specific Arbitration on the Issue of Whether Maryland Diligently Enforced during 2004 and Petition to Vacate Arbitration Award Finding that [Maryland] Did Not Diligently Enforce its Qualifying Statute During 2003.  We remand the case with instructions to have the Independent Auditor treat all 20 of the contested Term Sheet States as non-diligent when calculating Maryland's 2003 NPM Adjustment liability.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART.  CASE REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**