STATE EX REL. Eric GREITENS,
Appellant/Cross-Respondent,

v.

AMERICAN TOBACCO CO., et al.,
Respondents/Cross-Appellants,

and

Commonwealth Brands, Inc.,
et al., Appellants.

No. SC95422

Supreme Court of Missouri,
en banc.

Opinion issued February 14, 2017

The state was represented by Emily Ottenson and James P. Emanuel of the attorney general's office in Jefferson City, (573) 751-3321.

R.J. Reynolds and Phillip Morris were represented by Elli Leibenstein and Julia Emfinger of Greenberg Traurig in Chicago, (312) 456-8400; William Ray Price Jr., Jeffery T. McPherson and Thomas B. Weaver of Armstrong Teasdale LLP in St. Louis, (314) 621-5070; Robert F. Murray of Shands, Elbert, Gianoulakis & Giljum LLP in St. Louis, (314) 241-3963; and Peter J. Biersteker and Hashim M. Mooppan of Jones Day in Washington, D.C., (202) 879-3939.

Certain subsequent participating tobacco manufacturers were represented by Jonathan F. Dalton and Angela L. Odlum of Armstrong Teasdale LLP in St. Louis, (314) 621-5070; and Elizabeth B. McCallum and Robert J. Brookhiser Jr. of BakerHostetler LLP in Washington, D.C., (202) 861-1500.

Mary R. Russell, Judge

This case concerns disputes between Missouri and certain tobacco companies arising out of the Master Settlement Agreement ("MSA"). Tobacco manufacturers that participated in the MSA ("PMs"), Missouri, and other states arbitrated a dispute arising out of the MSA. One dispute concerned the application of the Non–Participating Manufacturer Adjustment ("NPM Adjustment"), a provision in the MSA that reduces the amount the PMs must pay to states that failed to diligently enforce certain legislation during a relevant year. During the arbitration proceedings, more than 20 states and the PMs entered into a partial settlement agreement. Missouri and other states did not join the settlement. The arbitration panel ("the Panel") issued a Stipulated Partial Settlement and Award ("Award"), which gave effect to the partial settlement and directed how the NPM Adjustment would be allocated among non-settling states in light of the settlement.

The Panel ultimately found that Missouri was not diligent in enforcing its legis-

lative enactment and, consequently, the NPM Adjustment applied to reduce Missouri's payment from the PMs for the year in question.

Missouri filed motions with the Circuit Court of the City of St. Louis seeking relief from the Panel's decisions.[1] Missouri asked for vacatur or modification of the Panel's Award, arguing the Award improperly amended the MSA in a manner that materially and adversely impacted Missouri's legal interests under the contract. Missouri also moved to compel the PMs to engage in a single-state arbitration with Missouri over another dispute regarding application of the NPM Adjustment in a subsequent year. The trial court overruled Missouri's motion to compel single-state arbitration, but modified the Award as requested by Missouri.

Missouri appeals from the trial court's judgment overruling its motion to compel single-state arbitration, arguing the MSA does not contain any provisions indicating that the parties agreed to arbitrate their disputes in a nationwide or multistate forum. This Court disagrees and finds that the text and structure of the MSA demonstrate the parties intended to arbitrate disputes relating to the NPM Adjustment in a multistate arbitration proceeding. Because the dispute for which Missouri sought to compel single-state arbitration concerns the NPM Adjustment dispute, the trial court correctly refused to compel single-state arbitration.

In their cross-appeal, the PMs argue that the trial court erred in modifying the Panel's Award because the Panel interpreted the parties' contract and, under the applicable standard of review, courts of this state are not permitted to review the merits of the Panel's interpretation. If the Panel's Award had interpreted ambiguous provisions of the MSA, the PMs would be correct. However, this Court finds that the relevant terms of the MSA were unambiguous and that the Panel exceeded its powers by amending those terms without the consent of Missouri and other states that were materially and negatively affected by the amendment. As a result, the Panel's Award was appropriately modified so that it no longer affects Missouri's contractual rights and expectations under the MSA.

The judgment of the trial court is affirmed.

## Factual Background

In 1998, 52 U.S. states and territories[2] entered into the MSA with the PMs.[3] Under the MSA, the states released the PMs from tobacco-related consumer protection and product liability lawsuits in return for the PMs' agreement to limit certain advertising and legislative activities and to make annual payments to the states in perpetuity. Non-participating manufacturers

---

1. This case was originally filed with Missouri's previous governor, Jeremiah "Jay" Nixon, named as relator for the State of Missouri. Since the time this case was filed, the voters of Missouri elected a new governor, Eric Greitens, and a motion to substitute Governor Greitens as the relator in this case has been sustained.

2. The MSA states include 46 U.S. states, five U.S. territories, and the District of Columbia. This opinion will refer to these jurisdictions collectively as "states."

3. PMs include both original participating manufacturers ("OPMs"), which are primarily large tobacco companies that negotiated the MSA with the states, and tobacco manufacturers that joined the agreement after it was made ("subsequent participating manufacturers," or "SPMs"). OPMs and SPMs have submitted separate briefs to this Court. As their interests and arguments align in all issues raised in this appeal, the Court will address their arguments together.

("NPMs") are tobacco companies that did not agree to the MSA.

The PMs' annual MSA payments are subject to a number of adjustments, which must be calculated by an Independent Auditor ("Auditor"). Once the Auditor calculates the amount the PMs are required to pay the states under the MSA for a given year, the PMs make payments to an escrow agent, who then apportions and distributes the funds to the states according to their contractually negotiated "allocable shares." [4]

One of the adjustments to the PMs' annual payments is the NPM Adjustment. To ensure the PMs did not lose market share to the NPMs, the drafters of the MSA included the NPM Adjustment, which reduces the amount the PMs must pay the states if: (1) the PMs' share of the national market for cigarettes decreases by two percentage points as compared to pre–MSA levels and (2) the MSA was a "significant factor" contributing to the national market share loss. If the Auditor concludes these conditions are met in a payment year, the NPM Adjustment amount may be deducted from every state's MSA payment on a pro rata basis according to the state's allocable share. A state may avoid having its MSA payment reduced, however, by showing that it enacted and "diligently enforced" legislation (referred to as a "qualifying statute") requiring the NPMs to escrow funds on a per-cigarette basis that is roughly equivalent to the PMs' per-cigarette payment under the MSA.[5] The allocable shares of the NPM Adjustment of "diligent" states

are then "reallocated" among the remaining, "non-diligent" states on a pro rata basis.

A dispute arose over the NPM Adjustment for the 2003 MSA Payment. The Auditor determined that the two preliminary conditions for application of the NPM Adjustment were satisfied in 2003 but declined to apply the adjustment because the states' diligence had not yet been determined. The Auditor sent the dispute to binding arbitration in accordance with the arbitration clause of the MSA. Missouri and other affected states refused to arbitrate and filed declaratory judgment actions in their respective state courts for a determination regarding the meaning of the term "diligently enforced" as used in the NPM Adjustment provisions of the MSA. The PMs moved to compel arbitration in these actions under the arbitration clause of the MSA, which provides that any dispute, controversy, or claim "arising out of or relating to" any calculations or determinations made by the Auditor "shall be submitted to binding arbitration." MSA § XI(c). Because the 2003 NPM Adjustment dispute arose out of and related to calculations or determinations made by the Auditor for the PMs' 2003 MSA payments, the trial court ordered Missouri to arbitrate its challenge to the application of the NPM Adjustment to the 2003 MSA Payment.

Missouri and 50 other states ultimately agreed to collectively arbitrate the 2003 NPM Adjustment dispute with the PMs pursuant to the Agreement Regarding Arbitration ("ARA").[6] The PMs incentivized

---

4. Missouri's allocable share is 2.2746011% of the PMs' annual payments.

5. The qualifying statute is intended to mitigate the market disadvantage the PMs incurred by agreeing to the terms of the MSA. When properly enforced, the qualifying statute also compels non-participating manufac-

turers to maintain sufficient funds to pay future tobacco-related judgments in favor of the states.

6. Because Montana's courts were alone in concluding that the 2003 NPM Adjustment dispute was not arbitrable, Montana was the

the states to join the multistate arbitration by offering a liability reduction of 20 percent for any state ultimately found not diligent and agreeing to release certain funds held in a disputed payments account.

At the initiation of the multistate arbitration, all states claimed they had diligently enforced their qualifying statutes, yet the PMs originally contested the diligence of every state. Before the Panel heard arguments regarding the diligence of individual states, however, the PMs issued a "no-contest" determination as to 16 states ("no-contest states").

The Panel then held diligence hearings for the remaining contested states, starting with Missouri. At the outset of its hearing, Missouri sought to reserve the opportunity to challenge the diligence of any remaining contested states should the PMs decide to stop contesting the diligence of any state later in the arbitration proceedings. The Panel agreed that Missouri would be given that opportunity should the situation arise. At the diligence hearing, Missouri and the PMs introduced evidence regarding Missouri's attempts to enforce its qualifying statute in 2003 and presented fact witnesses who discussed the intended meaning of the term "diligently enforced" as used in the MSA.

As the Panel proceeded with the state-specific diligence hearings, the PMs and 22 states ("Term Sheet States") reached an agreement to settle disputes regarding the NPM Adjustment for 2003 and subsequent years (the "Term Sheet Settlement").[7] Only two of the Term Sheet States were no-contest states.

Missouri and other non–Term Sheet States objected to the settlement, arguing that it negatively affected their rights under the MSA. Despite those objections, the Panel entered its Award giving effect to the Term Sheet Settlement. Because the NPM Adjustment provisions of the MSA were silent as to how the Panel should proceed after a partial settlement, the Panel applied a common law pro rata judgement reduction method to the NPM Adjustment, reducing the available NPM Adjustment amount by the aggregated shares of the Term Sheet States. The Panel determined that the non–Term Sheet States would not be prejudiced by the Term Sheet Settlement if the NPM Adjustment was reduced according to this judgment reduction scheme. The Panel's order then directed the Auditor to treat Term Sheet States as "not subject to" the NPM Adjustment for purposes of the allocation and reallocation provisions of the MSA. The diligence of contested Term Sheet States was never determined by the Panel.

The Panel then issued its final awards determining the diligence of the 15 contested, non–Term Sheet States. It concluded that Missouri and five other states had not been diligent in enforcing their qualifying statutes, while the remaining states were diligent. As a result, Missouri and the other states found not diligent bore their own allocated share of the NPM Adjustment as well as the shares reallocated from the no-contest states (excluding the two no-contest states that agreed to the

only MSA state that did not participate in the 2003 Arbitration.

**7.** All states were invited to sign the Term Sheet. Originally 19 states signed the Term Sheet Settlement, and three more states decided to join the settlement at some later point in the arbitration proceedings.

Missouri indicates that several states were allowed to join the Term Sheet Settlement after the arbitration was closed as well. Missouri attempted to pass legislation that would have permitted it to join in the settlement, but was unsuccessful in doing so.

Term Sheet Settlement) and the nine contested states found diligent by the Panel. Missouri's MSA payment for 2003 was reduced by an additional $50 million due to its liability for the reallocated shares of the NPM Adjustment from the no-contest states and the states found diligent by the Panel.

Missouri moved to vacate the Panel's finding that Missouri was not diligent in enforcing its qualifying statute in the Circuit Court of the City of St. Louis, and asked the trial court to modify the Award by treating the Term Sheet States as "non-diligent" for purposes of calculating Missouri's liability for the NPM Adjustment. Missouri also sought an order from the trial court compelling single-state arbitration between Missouri and the PMs on the issue of the application of the 2004 NPM Adjustment to Missouri's 2004 MSA Payment.[8]

The trial court overruled Missouri's motion to vacate the Panel's final non-diligence determination[9] and its motion to compel single-state arbitration. The trial court did, however, modify the Panel's Award because it found that the Award erroneously violated the procedure for amending the MSA. The MSA prohibits amendments unless they are executed in writing by all states affected by the amendment. The trial court concluded that the Award effectively amended the MSA without the consent of the non–Term Sheet States by releasing the Term Sheet States from the NPM Adjustment alloca-

tion and reallocation provisions of the MSA. This amendment adversely affected Missouri and other non-diligent, non–Term Sheet States, according to the trial court, because their liability for the reallocated NPM Adjustment was substantially increased due to the significant reduction in potentially non-diligent states. Consequently, the trial court modified the Award and instructed the Auditor to treat as "non-diligent" the 20 Term Sheet States whose diligence was contested, but not proven, when calculating the NPM Adjustment applicable to Missouri's share of the PMs' MSA payments for 2003.

Missouri appeals the trial court's decision not to compel single-state arbitration between the PMs and Missouri. The PMs cross-appeal from the trial court's modification of the Panel's Award for the 2003 NPM Adjustment.[10]

## Discussion

### A. Modification of Award

#### 1. *Collateral Estoppel*

 As a preliminary matter, Missouri argues that the PMs are collaterally estopped from relitigating the issue of whether the Panel exceeded its powers in entering the Award because appellate courts in Pennsylvania and Maryland have already decided that issue against the PMs. *See Maryland v. Philip Morris, Inc.*, 225 Md.App. 214, 123 A.3d 660, 680 (2015), *cert. denied* 446 Md. 293, 132 A.3d 195 (2016), *cert. denied sub nom. R.J. Reyn-*

---

8. As it did for the 2003 payments, the Auditor determined that the two preliminary conditions for application of the NPM Adjustment were present in 2004 but declined to apply the adjustment to the PMs' payments in the absence of diligence determinations for the states. The Auditor again sent the dispute to binding arbitration, and the PMs again sought to initiate multistate arbitration proceedings with the states.

9. Missouri does not challenge this ruling on appeal.

10. This Court has jurisdiction pursuant to article V, section 10 of the Missouri Constitution.

olds Tobacco Co. v. Maryland, —— U.S. ——, 137 S.Ct. 295, 196 L.Ed.2d 213 (2016); *Pennsylvania ex rel. Kane v. Philip Morris USA, Inc.*, 114 A.3d 37 (Pa. Commw. Ct. 2015), *appeal denied*, 129 A.3d 1244 (Pa. 2015), *cert. denied sub nom. R.J. Reynolds Tobacco Co. v. Kane*, —— U.S. ——, 137 S.Ct. 292, 196 L.Ed.2d 212 (2016). Under collateral estoppel, also known as issue preclusion, a court's decision about an issue of fact or law that is necessary to the court's judgment may preclude relitigation of that issue in a lawsuit about a different cause of action involving a party to the first case. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). The preclusive effect of a judgment is generally determined by laws of the jurisdiction in which the judgment was rendered. *Strobehn v. Mason*, 397 S.W.3d 487, 494 (Mo. App. W.D. 2013) (citing RESTATEMENT (2D) OF CONFLICT OF LAWS § 95 (1971)). Because the decisions on which Missouri relies were issued by courts in Maryland and Pennsylvania, this Court will look to the laws of those states to determine the preclusive effect of those decisions on the present proceedings.

Missouri's position that two appellate court decisions issued during the pendency of this appeal should collaterally estop the PMs from pursuing this legal issue is untenable. First, as the PMs point out, decisions from other courts about this issue are inconsistent. While Missouri's brief focuses exclusively on the appellate court decisions in Pennsylvania and Maryland holding that the Panel exceeded its powers, an unappealed trial court order from Colorado reached the opposite conclusion. *Colorado ex. rel. Suthers*, No. 1997CV3432 (Colo. D. Ct. Feb. 11, 2014). When prior decisions on the issue are inconsistent, it would be unfair to apply non-mutual collateral estoppel because doing so would give preclusive effect to decisions that are favorable to the party seeking preclusion while ignoring any unfavorable decisions. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ("Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant."); *see also Garrity v. Md. State Bd. of Plumbing*, 447 Md. 359, 135 A.3d 452, 460 (2016); *Office of Disciplinary Counsel v. Kiesewetter*, 585 Pa. 477, 889 A.2d 47, 52 (2005); *Bi–State Dev. Agency v. Whelan Sec. Co.*, 679 S.W.2d 332, 336–37 (Mo. App. E.D. 1984).

Second, applying non-mutual, offensive collateral estoppel in the manner sought by Missouri would deprive the PMs of the opportunity to fully and fairly litigate this issue because of the unique structure of the MSA. *Colandrea v. Wilde Lake Cmty. Ass'n*, 361 Md. 371, 761 A.2d 899, 909 (2000) (party against whom preclusion is sought must have had a fair opportunity to litigate the issue); *Office of Disciplinary Counsel v. Duffield*, 537 Pa. 485, 644 A.2d 1186, 1189 (1994) (for collateral estoppel to apply, the party must have had a full and fair opportunity to litigate the issue in the prior proceeding); *see also James v. Paul*, 49 S.W.3d 678, 682 (Mo. banc 2001) (the party against whom collateral estoppel is asserted must have been given a full and fair opportunity to litigate the issue in the prior suit). Under the dispute resolution provisions of the MSA, any non-arbitrable dispute must be litigated in the designated MSA court of each state, even if the dispute concerns issues common to many or all states. The PMs are required to litigate their claims against each state individually, and a decision favorable to the PMs by one court could not bind other states or collaterally estop them from relitigating the same issues against the PMs in their own state courts. Allowing the states, based on

one or two favorable decisions, to collaterally estop the PMs nationwide when the PMs have no opportunity to do the same would be manifestly unfair.

The PMs are not precluded from litigating the issue of whether the Panel exceeded its powers when it entered its Award.

## 2. Standard of Review

 This Court will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 431 (Mo. banc 2015). Whether the Panel exceeded its power is a legal question subject to *de novo* review. *Behnen v. A.G. Edwards & Sons, Inc.*, 285 S.W.3d 777, 779 (Mo. App. E.D. 2009).

The parties agree that the Federal Arbitration Act ("FAA"), codified at 9 U.S.C. § 1 *et. seq.*, provides the governing standard for this Court's review of the Panel's Award.[11] Both parties point to *Oxford Health Plans LLC v. Sutter* as the United States Supreme Court's most recent, controlling statement of the applicable standard of review for this case. ── U.S. ──, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013).

The FAA limits judicial review of arbitration awards to maintain arbitration's ability to provide efficient and streamlined dispute resolution outside of "full-bore" legal proceedings. *Id.* at 2068. Courts may vacate an arbitrator's award under the FAA "only in very unusual circumstances." *Id.* Under the FAA, a court may vacate an arbitration award when: (1) the award was "procured by corruption, fraud, or undue means"; (2) the arbitrators demonstrated partiality or corruption; (3) the arbitrators committed misconduct in "refusing to postpone a hearing" or "to hear evidence pertinent and material to the controversy"; (4) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made"; and (5) a person who was not a party to an arbitration in an administrative context is "adversely affected or aggrieved by the award." 9 U.S.C. § 10(a)(1)–(4), (c).

 Missouri moved for vacatur or modification of the Panel's Award under 9 U.S.C. § 10(a)(4).[12] This statute imposes a

---

11. The FAA governs arbitration agreements that involve interstate commerce, which certainly includes the MSA. *See* 9 U.S.C. § 2. Additionally, the MSA required that the 2003 NPM Adjustment arbitration proceed under the FAA. MSA § XI(c). The MSA also provided, however, that disputes between a state and the PMs will be governed by the laws of the state. MSA § XVIII(n). These provisions create some uncertainty as to whether the FAA or state arbitration law applies to the issues presently before this Court.

Because of this uncertainty, Missouri moved to vacate or modify the Panel's Award under both the FAA and Missouri law (9 U.S.C. § 10(a)(3)–(4) and sections 435.405.1, 435.370(2), RSMo 2000), and the trial court cited to both federal and state statutes in its judgment. As Missouri notes in its substitute brief, the language of the FAA and Missouri's equivalent statute is "nearly identical," and both parties base their arguments to this Court on the FAA and case law interpreting its provisions.

12. Missouri also cited Missouri's similar statutory enactment, section 435.405.1(3), which provides:

1. Upon application of a party, the court shall vacate an award where:
(1) The award was procured by corruption, fraud or other undue means;
(2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;
(3) The arbitrators exceeded their powers;
(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provi-

high bar to attain the relief Missouri seeks. To show that the Panel "exceed[ed] [its] powers," Missouri must prove that the Panel "act[ed] outside the scope of [its] contractually delegated authority" by issuing an award reflecting the Panel's "own notions of economic justice" rather than "drawing its essence from the contract." *Oxford Health*, 133 S.Ct. at 2068 (internal quotations and alterations omitted). Under this standard, it is not enough to show that the Panel made even a serious mistake in construing the provisions of the MSA that were subject to binding arbitration. *Id.* "Because the parties bargained for the arbitrator's construction of [those portions of] their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits." *Id.* (internal quotations omitted).

■ The PMs argue that the trial court impermissibly modified the Award by reviewing the merits of the Panel's interpretation of the MSA under a more lenient "clearly erroneous" standard rather than the FAA standard set out above. The PMs base this argument on the trial court's conclusion that the Panel's use of a common law judgment reduction method to reduce the amount of the NPM Adjustment by the allocable shares of the Term Sheet States was "clearly erroneous as it violates the MSA's procedure for amending the MSA." Despite the trial court's perhaps confusing use of the words "clearly erroneous," the trial court did not apply a clearly erroneous standard of review to the Panel's Award. Prior to this isolated statement on which the PMs solely rely for this argument, the trial court clearly artic-

ulated the FAA's standard of review in its judgment before considering the claims raised by the parties. Read in context, the trial court applied the FAA standard of review when it agreed with Missouri's argument that the Panel "exceeded [its] authority" by amending the MSA without the consent of Missouri and other states.

■ Even if the trial court had applied an incorrect standard of review, appellate courts are "primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result," and the trial court's judgment must be "affirmed if cognizable under any theory," regardless of whether the trial court's reasoning is wrong or insufficient. *Rouner v. Wise*, 446 S.W.3d 242, 249 (Mo. banc 2014).

### 3. Analysis

■ As the Supreme Court stated in *Oxford Health*, the only question presented by the PMs' appeal is "whether the arbitrator (even arguably) interpreted the parties' contract, not whether [the Panel] got its meaning right or wrong." 133 S.Ct. at 2068. To determine whether the Panel interpreted or amended the MSA, this Court begins with the text of the parties' agreement.

The MSA's arbitration clause submits any dispute or claim "arising out of or relating to calculations performed by, or any determination made by, the Independent Auditor," including the NPM Adjustment, to binding arbitration. MSA § 11(c). Under the MSA's arbitration agreement, the Panel had the power to determine any

sions of section 435.370, as to prejudice substantially the rights of a party; or
(5) There was no arbitration agreement and the issue was not adversely determined in proceedings pursuant to section 435.355 and the party did not participate in the

arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

questions arising from or relating to the Auditor's calculation of the 2003 NPM Adjustment, including how the adjustment should be calculated and distributed after some of the states settled with the PMs.

The NPM Adjustment decreases the PMs' payments to the states if the PMs lose a certain amount of market share to non-participating tobacco manufacturers due to the MSA. MSA § IX(d)(1)(A). If the conditions for applying the NPM Adjustment are met in a given year, the MSA provides that the adjustment "shall apply" to the payments of the states. MSA § IX(d)(2)(A). The MSA contains an exception under which states may avoid reduction of their annual payments if they enacted and diligently enforced qualifying statutes in the relevant year. MSA § IX(d)(2)(B). States that diligently enforced their qualifying statutes receive payments from the PMs that are "not subject to" an NPM Adjustment. MSA § IX(d)(2)(B). The diligent states' shares of the NPM Adjustment, however, do not disappear: "The aggregate amount of the NPM Adjustments that would have applied to the Allocated Payments of the [diligent states] shall be reallocated among all other [states] pro rata in proportion to their respective Allocable Shares." MSA § IX(d)(2)(C).

The MSA does not specify what should be done when some states and the PMs decide to settle a dispute about imposing the NPM Adjustment, as occurred here. In the absence of express provisions in the MSA, the Panel looked to common law judgment reduction methods to address the partial settlement. Noting that the MSA called for "pro rata" reallocation of the diligent states' shares of the NPM Adjustment among non-diligent states, the Panel selected a common law pro rata judgment reduction method to reduce the amount of the total NPM Adjustment by

the collective shares of the states that agreed to the Term Sheet Settlement. It then instructed the Auditor to treat the Term Sheet States as "not subject to" the allocation and reallocation provisions of the MSA.

The PMs argue that, in so doing, the Panel appropriately interpreted the MSA and that, as a result, the merits of the Panel's interpretation are not subject to review by the courts of this state. The PMs also contend that, even if the Court could review the Award, the Panel reasonably and correctly interpreted the MSA in issuing the Award. Missouri, on the other hand, contends that the Panel exceeded its powers by substituting the express provisions of the MSA with the Panel's own notions of economic justice and amending the MSA without the consent of Missouri and other non–Term Sheet States.

Considering the parties' well-reasoned arguments, this Court agrees with Missouri. After finding that the MSA did not explicitly set forth procedures to follow in the event of a partial settlement of an NPM Adjustment dispute, the Panel immediately turned to background law to "fill the gap," explaining at length why it found one common law judgment reduction method more fitting than two others. But the Panel failed to first consider whether the MSA's silence actually created an ambiguity requiring the Panel to resort to such default legal rules to construe the contract.

A contract's silence about an issue does not necessarily create an ambiguity. *See Morelock–Ross Props., Inc. v. English Vill. Not–for–Profit Sewer Corp.*, 308 S.W.3d 275, 280 (Mo. App. S.D. 2010) (silence in a contract does not create an ambiguity, especially when both parties are "sophisticated bargainers"). A contract is ambiguous only if its terms are susceptible of more than one meaning such that

"reasonable [parties] may fairly and honestly differ in their construction of the terms." *Eisenberg v. Redd*, 38 S.W.3d 409, 411 (Mo. banc 2001). An arbitrator may interpret ambiguous language, but the arbitrator cannot "disregard or modify unambiguous contract provisions." *Mo. River Servs., Inc. v. Omaha Tribe of Neb.*, 267 F.3d 848, 855 (8th Cir. 2001) (internal quotations omitted). If an arbitrator "interprets unambiguous language in any way different from its plain meaning, the arbitrator amends or alters the agreement and acts without authority." *Id.* (internal quotations and alterations omitted).

The MSA's provisions for the distribution of the NPM Adjustment were not ambiguous. The MSA clearly and unambiguously provided that only states found to have diligently enforced their qualifying statutes would be treated as "not subject to" the NPM Adjustment. "All" other states would be responsible for (1) their own allocated shares of the NPM Adjustment and (2) their proportionate share of the aggregated reallocated shares of the diligent states.

The fact of a partial settlement did not create an ambiguity in these terms, nor did it prevent the Panel from following the procedures dictated by the NPM Adjustment provisions. Contradicting the express contract terms, the Panel's Award instead deemed the contested Term Sheet States as "not subject to" the allocation and reallocation provisions of the MSA without first finding that they had diligently enforced their qualifying statutes. And in place of the MSA's allocation and reallocation terms, the Panel substituted a common law judgment reduction scheme to reduce the NPM Adjustment amount by the aggregated shares of the Term Sheet States. Because the MSA's NPM Adjustment provisions were not ambiguous, the Panel's deviation from those express terms effectively amended the MSA, substituting its own notions of economic justice for the clear provisions of the MSA. [13]

Further, the MSA provides that the parties' agreement may only be amended "by a written instrument executed by all [PMs] affected by the amendment and by *all [states] affected by the amendment*." MSA § XVIII(j) (emphasis added). Contradicting this clear and unambiguous term, the Panel's Award amended the MSA by treating contested Term Sheet States as "not subject to" the NPM Adjustment and replacing the MSA's unambiguous allocation and reallocation provisions with a common law judgment reduction scheme without the consent of Missouri and other affected states.

13. The parties debate whether a number of preliminary rulings by the Panel influence the question of whether the Panel's Award constitutes an interpretation of the MSA or an amendment thereto. Missouri argues that the Panel's ruling placing the burden of proof of showing diligence on the states demonstrates the Panel originally interpreted the MSA as imposing the NPM Adjustment on states unless and until the states proved their diligence. The PMs respond the Panel also ruled, at the urging of Missouri and other states, that the MSA does not create a legal presumption that the states were not diligent in enforcing their qualifying statutes, so the Panel's refusal to treat all contested Term Sheet States as "non-diligent" was consistent with the Panel's earlier interpretation of the MSA.

Whether the Panel's Award was consistent with its earlier rulings is not the question before this Court. It is because the Panel excused the contested Term Sheet States from diligence determinations and from the MSA's allocation and reallocation provisions, thereby materially modifying the MSA's NPM Adjustment distribution scheme without the consent of Missouri and other non-settling states, that the Award exceeded the Panel's powers. That conclusion does not depend on the parties' prior arguments to the Panel or on the Panel's preliminary rulings.

The Award effectively excused the 20 contested Term Sheet States from any determination of their diligence, then mandated that they be treated as "not subject to" the allocation and reallocation provisions of the MSA.[14] This action significantly altered the calculation and effect of the NPM Adjustment. When the parties entered the MSA, they bargained for allocation of the NPM Adjustment among all the states, which could then be reallocated from diligent to non-diligent states. Under that distribution plan, non-diligent states bear not only their own allocated share of the adjustment, but also a proportionate amount of any adjustment reallocated from states found to be diligent. Consequently, as the number of diligent states rises, the burden on the non-diligent states increases, not only because more of the adjustment is being reallocated, but also because *the pool of non-diligent states decreases.* Because of the way the MSA's reallocation provisions function, the number of states that might be found not diligent is extremely important to the potential liability the states have for the NPM Adjustment.

The Panel seemingly acknowledged the Term Sheet Settlement could have an adverse impact on the non–Term Sheet States and implemented a common law judgment reduction method to remove the Term Sheet States' allocable shares from the NPM Adjustment that would be allocated among the non–Term Sheet States. While the Panel's judgment reduction ensured the non–Term Sheet States would not be allocated any NPM Adjustment originally attributable to Term Sheet States, it failed to account in any way for the removal of the Term Sheet States from the pool of potentially non-diligent states that would share the reallocated adjustment. By directing the Auditor to treat the contested Term Sheet States as "not subject to" the reallocation provisions of the MSA, the Panel removed them from the potential pool of states that would bear the reallocated NPM adjustment without first finding that the Term Sheet States were diligent. As noted above, the Panel's decision not to determine the diligence of the contested Term Sheet States and instead to treat them as "not subject to" the allocation and reallocation provisions of the MSA contradicts the express terms of the MSA and effectively amends the parties' agreed-upon method for distributing liability for the NPM Adjustment among the states.

The Panel's amendment to the MSA significantly altered the rights and expectations of all parties to the MSA, and there is no doubt that Missouri was materially affected by the amendment. Of the states that participated in the 2003 NPM Adjustment arbitration, 16 states were deemed diligent because no party contested their

---

14. The PMs claim Missouri and other states that objected to the Term Sheet Settlement did not ask the Panel to conduct diligence hearings for contested Term Sheet States, but instead only asked that all such states be considered "non-diligent" for purposes of calculating the reallocated NPM Adjustment. The PMs argue Missouri should not now be heard to complain that this was error when Missouri did not raise that argument during the arbitration proceedings.

The PMs' claim is not supported by the record. States objecting to the Term Sheet Settlement, including Missouri, filed a brief in which they asked for the chance to contest the diligence of contested Term Sheet States should the Panel decide to give effect to the Term Sheet Settlement without treating contested Term Sheet States as "non-diligent" for purposes of calculating the reallocated NPM adjustment. Missouri did seek diligence determinations of contested Term Sheet States before the Panel. Moreover, any arguments Missouri raised during the arbitration proceedings do not affect the scope of the Panel's power, which is the question before this Court.

enforcement efforts. This left 35 contested states, and 20 of the contested states signed the Term Sheet Settlement, thereby avoiding any liability for reallocated NPM adjustment under the Award. The Panel's Award reduced the number of potentially non-diligent states by more than half when it excluded the Term Sheet States from the allocation and reallocation provisions of the MSA. Ultimately, only Missouri and five other states that were also found to be non-diligent shared the burden of the allocated and reallocated amounts of the NPM Adjustment. Even after the Panel reduced the total amount of the NPM Adjustment for 2003 by the aggregated shares of the Term Sheet States, Missouri's payment from the PMs for 2003 was reduced by approximately $50 million dollars due to the reallocated NPM Adjustment.

Missouri provides extensive calculations demonstrating that, unless more than two-thirds of the Term Sheet States had been found diligent by the Panel, Missouri would have fared better under the unaltered terms of the MSA—even without any judgment reduction—than it did under the Panel's Award. Because no diligence determinations were made for the Term Sheet States, these numbers are only hypothetical. However, Missouri's calculations demonstrate that the Panel's amendment of the NPM Adjustment provisions significantly altered the bargained-for expectations and obligations of the PMs, the

Term Sheet States, and the non–Term Sheet States.

Because Missouri was affected by the Panel's Award amending the NPM Adjustment provisions of the MSA, Missouri's consent to the amendment was required under section XVIII(j) of the MSA. Consequently, the Panel's Award contradicted clear and unambiguous amendment provisions of the MSA, and the Panel exceeded its powers.

In conclusion, this Court finds that the Panel exceeded its powers by issuing an award reflecting its own notions of economic justice and amending the MSA without the consent of all affected parties. As the trial court correctly noted, the only way to prevent the Award from affecting Missouri's rights under the MSA is to treat the 20 contested Term Sheet States as not diligent when calculating the amount of the 2003 NPM Adjustment for which Missouri is liable.[15] This result is consistent with decisions issued by the Court of Special Appeals of Maryland and the Commonwealth Court of Pennsylvania, which are the only appellate courts of other states that have so far considered this issue. *Maryland*, 123 A.3d 660; *Pennsylvania ex rel. Kane*, 114 A.3d 37.

## B. Single–State Arbitration

### 1. Standard of Review

 The trial court's judgment will be affirmed unless there is no substantial evi-

---

**15.** The PMs claim that this "all non-diligent approach" improperly gives a "windfall" to Missouri because, in all probability, some of the contested Term Sheet States would have been found diligent. Because the Panel did not hold diligence hearings for those states and the arbitration is now closed, there is no way to determine how many of the states, if any, would have been found diligent, and, therefore, there is no way to determine whether or to what extent this Court's ruling may unduly benefit Missouri. This Court cannot require the Panel to reopen arbitration

proceedings to conduct diligence hearings for all contested Term Sheet States. As discussed at length in this opinion, the Panel's decision to treat all contested Term Sheet States as "not subject to" the NPM Adjustment dispute improperly amended the express provisions of the MSA without the consent of all affected parties, including Missouri. At this point, the only way to prevent the Panel's unauthorized amendment from adversely affecting Missouri is to calculate its payment as though the contested Term Sheet States had been found not diligent.

dence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Eaton*, 461 S.W.3d at 431. Whether the trial court should have granted a motion to compel arbitration is a question of law subject to *de novo* review. *Ellis v. JF Enters., LLC*, 482 S.W.3d 417, 419 (Mo. banc 2016).

 A trial court's judgment is against the weight of the evidence only if the court could not reasonably have found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. *Ivie v. Smith*, 439 S.W.3d 189, 206 (Mo. banc 2014). This standard serves only to check the trial court's "potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Id.* When considering whether a judgment is against the weight of the evidence, this Court defers to the trial court's findings regarding contested facts. *Id.* Fact issues for which no specific findings are made shall be presumed to have been found in accordance with the result reached. Rule 73.01; *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 626 (Mo. banc 2014). When the evidence poses two reasonable but different conclusions, appellate courts are obligated to defer to the trial court's assessment of the evidence. *J.A.R.*, 426 S.W.3d at 626.

## 2. Analysis

 Missouri argues the trial court erred in overruling Missouri's motion to compel single-state arbitration. It first contends the trial court's judgment misapplies the Federal Arbitration Act (FAA) and federal case law by inferring Missouri's consent to a specific arbitration procedure—multistate arbitration—solely from the fact of Missouri's agreement to arbitrate.

 Courts examine arbitration agreements as they would any other contractual agreement, and the customary rules of state contract law and contract interpretation apply. *Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005). When construing an arbitration clause, courts must ascertain the intent of the parties and give effect to that intent. *Id.* The parties' intent is presumably manifested in the plain, ordinary, and usual meaning of the contract's terms. *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003). A contract is ambiguous only if its terms are susceptible to fair and honest differences in interpretation. *Id.* If a contract is unambiguous, the parties' intent may be gathered from the terms of the contract alone, and no extrinsic evidence may be introduced to contradict the terms of the contract or to create an ambiguity. *Id.* at 428–29.

 At the heart of the FAA is the principle that arbitration is a matter of consent. *Stolt–Nielsen, S.A. v. Animal-Feeds Int'l Corp.*, 559 U.S. 662, 681, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010). Parties may structure arbitration agreements as they see fit and may limit the scope of arbitration, select the rules under which the arbitration is to proceed, and establish qualifications for arbitrators. *Id.* at 683, 130 S.Ct. 1758. Parties may also "specify *with whom* they choose to arbitrate their disputes." *Id.* (emphasis in original).

Missouri argues that *Stolt–Nielsen* mandates single-state arbitration here because the MSA's arbitration clause does not provide a basis to find that the parties agreed to multistate arbitration proceedings. In *Stolt–Nielsen*, an arbitration panel ordered the parties to participate in class arbitration at the request of one party and contrary to the wishes of the other. *Id.* at 668, 130 S.Ct. 1758. During the arbitration, the

parties stipulated that the arbitration clause was "silent" regarding class arbitration, meaning that "no agreement" was reached about that issue. *Id.* at 668–69, 130 S.Ct. 1758. Nonetheless, the arbitration panel ordered class arbitration. *Id.* at 669, 130 S.Ct. 1758. The United States Supreme Court reversed, holding a party may not be compelled to submit to class arbitration "unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 684, 130 S.Ct. 1758 (emphasis in original). Although the Supreme Court acknowledged that, in some contexts, "it is appropriate to presume that parties [to an arbitration agreement] implicitly authorize the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement," an implicit agreement to class arbitration cannot be inferred "solely from the fact of the parties' agreement to arbitrate." *Id.* at 684–85, 130 S.Ct. 1758. Because the parties concurred that they had reached no agreement regarding class proceedings, the Supreme Court held there was no basis in the parties' contract to compel participation in class arbitration. *Id.* at 687, 130 S.Ct. 1758.

*Stolt–Nielsen* cannot be read as disapproving or impeding arbitration agreements that contemplate consolidated or class arbitration proceedings. As the United States Supreme Court later explained of its holding in *Stolt–Nielsen*: "We overturned the arbitral decision there because it lacked *any* contractual basis for ordering class procedures, not because it lacked ... a 'sufficient' one." [16] *Oxford Health*,

133 S.Ct. at 2069 (emphasis in original). Because the parties in *Stolt–Nielsen* stipulated that they had reached no agreement on class arbitration, the panel's decision could not have been based on the parties' intent or the terms of the parties' contract. *Id.* at 2069–70. This case is unlike *Stolt–Nielsen*, as it does not concern class arbitration, nor did the parties here stipulate that they had never reached an agreement on multistate arbitration proceedings.

Moreover, the text and structure of the MSA provide a sufficient basis to conclude that the states and the PMs contemplated and agreed to multistate arbitrations, even though the MSA does not explicitly require such procedures. The MSA's arbitration clause requires that any "dispute" arising out of or relating to the Auditor's payment determinations or calculations be submitted to binding arbitration. MSA § XI(c). Should an arbitrable dispute develop, the MSA directs "the two sides to the dispute" to select one arbitrator each. *Id.*

The parties agree the present dispute is subject to arbitration. They also agree the nature of the arbitration required by the MSA depends on the nature of the dispute to be arbitrated. Where the parties disagree is the nature of the present dispute. Missouri acknowledges the two conditions for imposing the NPM Adjustment were met in 2004. All that remains for an arbitration panel to decide, Missouri contends, is "whether Missouri diligently enforced its qualifying statute in 2004." According to Missouri, the "two sides" to that dispute are Missouri, on one side, and the PMs on

---

**16.** This Court notes that the Supreme Court in *Stolt–Nielsen* and *Oxford Health* reviewed decisions made by arbitrators to permit class arbitration under the highly deferential standard of review required by the FAA. Here, the question of whether the trial court correctly applied the law in overruling Missouri's motion to compel single-state arbitration is subject to *de novo* review. *Ellis,* 482 S.W.3d at 419. The Supreme Court's analysis in *Stolt–Nielsen* and *Oxford Health* is still instructive for purposes of determining whether there is a sufficient basis in the MSA to conclude the parties agreed to participate in multistate arbitration proceedings.

the other. Missouri claims other states have no place in this dispute, although it acknowledges other states have an adverse interest in Missouri's diligence determination because of the reallocation provisions of the MSA. Even if other states are interested parties in Missouri's diligence hearing, Missouri reasons, other states should not be considered to be on the same "side" as Missouri with regard to that question.

The PMs characterize the dispute more broadly as whether they are entitled to an NPM Adjustment for the 2004 payment year and argue the "two sides" to that dispute are the states opposing the adjustment on one side and the PMs advocating for the adjustment on the other.

This Court agrees with the PMs that the present dispute is whether the Auditor should have reduced the PMs' 2004 MSA payments by applying the NPM Adjustment. Missouri's individual diligence determination is but one part of that overarching matter. As was true for the 2003 payment year, the Auditor concluded that the NPM Adjustment could not be applied to the PMs' 2004 MSA payments even though the two preliminary conditions had been met because there had been no state diligence determinations.[17] The states sought this determination from the Auditor, while the PMs opposed it. Although the states may have competing interests in the diligence inquiries, they have a unified interest in the central dispute, which is whether the Auditor should have applied the NPM Adjustment for 2004, as well as in a number of preliminary matters that will arise in any arbitration of this issue.[18]

Missouri also argues the trial court's construction of the arbitration agreement improperly renders the words "to the dispute" superfluous by concluding the PMs and the states, collectively, are the "two sides" to the current dispute. *See State ex rel. Riverside Pipeline Co. v. Pub. Serv. Comm'n,* 215 S.W.3d 76, 84 (Mo. banc 2007) (courts must construe a contract so as not to render any terms meaningless). The trial court's judgement does not require all PMs and all states to be party to *every* arbitrable dispute under the MSA, as Missouri's argument assumes. Instead, it found that, in the context of the present dispute, the "two sides to the dispute" envisioned in the arbitration agreement are the PMs and the states because of the "interconnectedness" of the states' diligence determinations. In other words, the trial court concluded, as this Court now concludes, the present dispute extends much further than the narrow issue of Missouri's diligent enforcement. In these circumstances, the text of the MSA arbitration agreement contemplates a single, multistate arbitration proceeding between all of the PMs and all of the states.

The structure of the MSA also provides a contractual basis for compelling multistate arbitration. The MSA allocates the NPM Adjustment among the states and then reallocates shares from diligent states to non-diligent ones. These provisions guarantee the states' diligence inquiries

17. As the PMs point out, if every state diligently enforced its qualifying statute in 2004, there would be no NPM Adjustment to the PMs' payments for that year.

18. In 2003, such preliminary matters included: (1) whether the states or the PMs would carry the burden of proof regarding the diligence determinations; (2) whether the Panel should presume states were not diligent in enforcing their qualifying statutes; and (3)

what conclusion should be drawn regarding the diligence of a state whose diligence is not contested by the PMs or any other state. It stands to reason that an arbitration panel for the 2004 dispute will have to consider whether to follow the 2003 Panel's findings about these issues, make new determinations about these issues, or rule on other preliminary matters.

are, indeed, interconnected, as a determination that one state is diligent increases the reallocated share of the NPM Adjustment borne by states found non-diligent. As the trial court noted, this structure ensures that every state has an interest in the diligence determination of every other state. Consequently, if diligence determinations proceeded in single-state arbitration, all states would have to be given the opportunity to intervene in every state-specific diligence hearing to protect their interests in limiting their potential liability for reallocated shares of the NPM Adjustment. Additionally, the rules and standards applied by individual, single-state arbitration panels could vary greatly, which in turn could unfairly benefit some states and disadvantage others. A multistate arbitration proceeding under a uniform set of rules is needed to produce consistent and fair results for all parties to this dispute. While Missouri correctly notes that concerns of expeditious and efficient dispute resolution cannot override the parties' intent, the absurdity that would result from single-state arbitrations of diligence determinations supports the MSA's language and structure, which contemplate multistate arbitration of disputes related to NPM Adjustments.

Finally, the Court observes that its holding on this issue is consistent with opinions from appellate courts across the country that have overwhelmingly concluded that diligence determinations connected to the imposition of the 2003 and 2004 NPM Adjustments must proceed in a multistate arbitration. *See, e.g., Pennsylvania ex rel. Kane v. Philip Morris, Inc.*, 128 A.3d 334, 348–53 (Pa. Commw. Ct. 2015); *Maryland v. Philip Morris, Inc.*, 225 Md.App. 214, 123 A.3d 660, 683–86 (2015); *Alabama ex rel. Riley v. Lorillard Tobacco Co.*, 1 So.3d 1, 13–14 (Ala. 2008); *Connecticut v. Philip Morris, Inc.*, 279 Conn. 785, 905 A.2d 42, 50 (2006); *Illinois v. Lorillard Tobacco Co.*, 372 Ill.App.3d 190, 310 Ill.Dec. 222, 865 N.E.2d 546, 554 (2007); *Indiana ex rel. Carter v. Philip Morris Tobacco Co.*, 879 N.E.2d 1212, 1220 (Ind. Ct. App. 2008); *Maryland v. Philip Morris, Inc.*, 179 Md. App. 140, 944 A.2d 1167, 1180–81 (2008); *Massachusetts v. Philip Morris, Inc.*, 448 Mass. 836, 864 N.E.2d 505, 512 (2007); *New Mexico v. Am. Tobacco Co.*, 145 N.M. 134, 194 P.3d 749, 754–55 (2008); *Vermont v. Philip Morris USA Inc.*, 183 Vt. 176, 945 A.2d 887, 894–95 (2008); *McGraw v. Am. Tobacco Co.*, 224 W.Va. 211, 681 S.E.2d 96, 108–12 (2009).

█ Next, Missouri argues the trial court's judgment requiring multistate arbitration is against the weight of the evidence regarding the parties' course of dealing.[19] Specifically, Missouri claims that the Agreement Regarding Arbitration ("ARA"), in which the states agreed to multistate arbitration of the 2003 NPM Adjustment dispute, proves that Missouri and other states are not obligated to submit to multistate arbitration under the MSA because they voluntarily agreed to a nationwide arbitration for 2003 only after the PMs offered attractive incentives for the states to participate.

The PMs dispute this characterization of the evidence. They point out that the ARA was signed in 2008, by which time numerous courts had ordered states to arbitrate the 2003 NPM Adjustment dispute and

---

19. Missouri's first point on appeal contains multiple arguments, including that the trial court's judgment misapplied federal and state law and was against the weight of the evidence. Although the Court gratuitously addresses the substance of Missouri's arguments, Rule 84.04(d) prohibits a point relied on that groups together multiple contentions not related to a single issue, and such a point is subject to dismissal. *Mo. Bankers Ass'n, Inc. v. St. Louis Cnty.*, 448 S.W.3d 267, 271 n.5 (Mo. banc 2014).

related diligence determinations before one, nationwide arbitration panel.[20] The PMs contend that, despite such court orders, many states still refused to promptly cooperate in the arbitral process, leading the PMs to offer inducements to the states to expedite the dispute toward resolution in the contractually mandated forum.

The PMs' argument is logical and supported by the evidence. The ARA demonstrates that the PMs were willing to incentivize the states to join the multistate proceedings, but such willingness alone does not prove the states were otherwise free to abstain from participating in multistate arbitration. To the contrary, the chronological sequence of events shows many of the states were already under court order to participate in the nationwide 2003 arbitration before the parties signed the ARA. The record indicates, then, that the ARA was intended to induce the states to expediently do what was already contractually required of them. The trial court's judgment finding that the MSA requires multistate arbitration of the 2004 NPM Adjustment dispute, including Missouri's diligence determination, is not against the weight of the evidence.

■ Missouri next argues it should not have to participate in multistate arbitration of the 2004 NPM Adjustment dispute because actions taken by the PMs have rendered "single, nationwide arbitration of all [s]tates' diligent enforcement claims both unnecessary and impossible." Missouri contends that, as a result of the Term Sheet Settlement between the PMs and 22 states,[21] the Auditor will be instructed in the proper calculation and application of the 2004 NPM Adjustment by numerous "decision-makers," not just a single arbitration panel.

■ As discussed above, arbitration is a matter of consent, wherein the parties'

20. See, e.g., Alabama, 1 So.3d at 13–14; Connecticut, 905 A.2d at 50; Illinois, 310 Ill.Dec. 222, 865 N.E.2d at 554; Indiana, 879 N.E.2d at 1220; Maryland., 944 A.2d at 1180–81; Massachusetts, 864 N.E.2d at 512; New Mexico, 194 P.3d at 754–55; Vermont, 945 A.2d at 894–95.

21. Missouri also claims that, in addition to the Term Sheet Settlement, other actions taken by the PMs will cause as many as 11 different decision-makers to influence the Auditor's application of the 2004 NPM Adjustment. To support this argument, Missouri includes facts regarding: (1) the multistate arbitration of the 2004 NPM Adjustment dispute, which will allegedly proceed before four arbitrators sitting as two panels due to the PMs' inability to agree on an arbitrator and (2) a settlement between the PMs and New York. The PMs filed a motion to strike the sections of Missouri's reply brief and appendix including these facts, contending these portions of Missouri's filings involve newly raised facts outside the record on appeal. Missouri responds that this Court can consider facts from the documents attached in the appendix, even if those documents are not part of the record on appeal, because the records only recently became available and Rule 84.04(h)(3) allows the appendix to present "matters pertinent to the issues discussed in the brief such as copies of exhibits, excerpts from the written record, and copies of new cases or other pertinent authorities."

The Court ordered the motion to be taken with the case and now sustains the motion to strike. The facts included by Missouri in its reply brief and accompanying appendix are not "copies of exhibits, excerpts from the written record, copies of new cases, or other pertinent authorities." Instead, they are presented as new evidence. As this Court has previously held, "Rule 84.04(h) does not authorize inclusion of evidence outside the record on appeal." In re Adoption of C.M.B.R., 332 S.W.3d 793, 823 (Mo. banc 2011). Missouri has not sought judicial notice of these factual matters, nor do the disputed materials contain facts of common knowledge or such indisputable facts of which the Court could take judicial notice. English v. Old Am. Ins. Co., 426 S.W.2d 33, 41 (Mo. 1968). Consequently, the sections of Missouri's reply brief and accompanying appendix recounting these facts are stricken from the briefs.

intentions control. *Stolt–Nielsen*, 559 U.S. at 681, 130 S.Ct. 1758. Courts must, therefore, "rigorously enforce" arbitration agreements according to their terms. *Am. Exp. Co. v. Italian Colors Rest.*, —— U.S. ——, 133 S.Ct. 2304, 2309, 186 L.Ed.2d 417 (2013) (internal quotations omitted). The fact that some states have settled their disputes regarding the 2004 NPM Adjustment does not change the text and structure of the MSA, which require multistate arbitration of this dispute.

In arguing the Term Sheet Settlement renders nationwide or multistate arbitration "unnecessary and impossible," Missouri incorrectly assumes *every* party to the MSA, including Term Sheet States, must be party to an arbitration about the 2004 NPM Adjustment. Due to the settlement, however, Term Sheet States no longer have an active dispute with the PMs over the 2004 NPM Adjustment. Missouri fails to explain why the MSA requires participation from states with no present interest in the outcome of the proceeding, nor does Missouri explain why the absence of the Term Sheet States would prevent all interested parties from resolving their disputes. To the extent that Missouri and other non–Term Sheet States may experience some difficulty or inefficiency from the absence of the Term Sheet States at the 2004 arbitration, that hardship cannot override the language and structure of the MSA. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220–21, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (holding the preeminent concern of the FAA is to enforce private arbitration agreements according to their terms, even when doing so results in a more complicated or less efficient resolution of claims); *see also State ex rel. Mo. Highway & Transp. Comm'n v. Gillespie*, 86 S.W.3d 459, 467 (Mo. App. W.D. 2002) ("Courts will not interfere with a contract simply because it may work a hardship or later seem unfair to one of the parties.").

Finally, Missouri argues it was unfairly prejudiced by the multistate arbitration proceedings for the 2003 NPM Adjustment dispute because other states were allowed to present evidence of Missouri's diligent enforcement efforts during their own state-specific hearings when Missouri was not present and had no notice that such evidence would be adduced. Missouri contends the Panel inappropriately considered this evidence in concluding that Missouri was not diligent in enforcing its qualifying statute. Missouri claims that it was denied due process and a fair hearing as a result, and that it will be subjected to the same prejudice if forced to participate in a multistate arbitration proceeding for the 2004 MSA payment year.

As noted above, Missouri's fairness concerns cannot override the language and structure of the MSA, which require multistate arbitration proceedings. This Court must enforce the terms of the MSA as the parties intended and cannot protect Missouri from unanticipated or unpleasant repercussions of its own agreement. *See Gillespie*, 86 S.W.3d at 467; *Ricks v. Mo. Local Gov't Emps.' Ret. Sys.*, 981 S.W.2d 585, 595 (Mo. App. W.D. 1998) (appellate courts do not interfere "with either the allocation of risks or the rights and obligations validly agreed to by the parties on the basis of a regrettable result").

Further, Missouri has not shown it was prejudiced by any alleged unfairness or misconduct during the 2003 arbitration. Missouri argued in the trial court for vacatur of the Panel's final determination that Missouri was not diligent because of the allegedly unfair and prejudicial actions of the Panel in considering "ex parte communications." Although Missouri's briefs note that vacatur of an award may be appropri-

ate when an arbitrator commits misconduct by receiving ex parte communications, considering evidence that is not properly presented at the hearings, or refusing to receive pertinent and material evidence, Missouri does not actually appeal the trial court's judgment affirming the Panel's non-diligent determination for Missouri. In refusing to vacate the Panel's final non-diligence determination, the trial court concluded that Missouri had not shown the Panel was unduly influenced by any ex parte communications and that there was "abundant evidence" presented in Missouri's diligence hearing to support the Panel's finding that Missouri was not diligent. Additionally, Missouri characterizes the other states' comments regarding Missouri's diligence as "ex parte communications," but those statements were made on the record in formal hearings and, while Missouri was apparently not notified that it would be the subject of some discussion at the hearings, it was given notice of, and the opportunity to be present at, each of those diligence hearings.

While the Court acknowledges Missouri's concerns regarding the procedural fairness of a multistate arbitration forum for NPM Adjustment disputes, it has not shown it was prejudiced by any unfair proceedings or arbitral misconduct in the 2003 arbitration, nor has Missouri shown the 2004 arbitration must necessarily suffer from the same defects of which Missouri here complains. Ultimately, this Court must enforce the terms of the MSA as agreed to by the parties, and those terms require multistate arbitration of the 2004 NPM Adjustment dispute.

### Conclusion

The judgment of the trial court is affirmed.

Breckenridge, C.J., Fischer and Draper, JJ., concur.

Stith and Wilson, JJ., not participating.